ATTORNEY FOR APPELLANT
Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

In the

# Indiana Supreme Court

FILED
Jul 31 2012, 3:24 pm

CLERK
of the supreme court,
court of appeals and
tax court

No. 58S00-1011-CR-634

ANDREW CONLEY,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below),*

Appeal from the Ohio Circuit Court, Cause No. 58C01-0912-MR-001
The Honorable James Humphrey, Judge

On Direct Appeal

**July 31, 2012**

**David, Justice.**

This case involves a seventeen-and-a-half-year-old who murdered his ten-year-old brother. Andrew Conley confessed to the crime and pleaded guilty to murdering his brother, Conner, while Conley was babysitting Conner. Following five days of sentencing testimony, including the testimony of twelve witnesses and one-hundred-and-fifty-five exhibits, the trial court judge sentenced Conley to life without parole. We hold that based on the age of Conley, the age of Conner, and the particularly heinous nature of the crime, a sentence of life without

parole was appropriate. We hold that on the facts of this case, the sentence of life without parole is constitutional.

## Facts and Procedural History

The undisputed facts are as follows. On Saturday, November 28, 2009, Conley was seventeen-and-a-half-year-old when he murdered his ten-year-old brother, Conner. The murder took place between 8:30 p.m. and 10:00 p.m. His mother and adoptive father were at work that evening until the early morning hours. As was not uncommon, Conley was responsible for watching Conner that evening. Conley's mother told him he would have to find a babysitter for Conner if he wished to go out with his friends.

Conley wanted to go out that evening, so Conley drove Conner to their grandmother's house in Rising Sun, Indiana, but she was not home. He next asked his uncle to watch Conner but was told no. After they returned home, Conley and Conner began wrestling.

At some point, Conley got behind his brother and choked him in a headlock with his arm until Conner passed out. Conner was bleeding from the nose and mouth. Conner was still breathing. Conley drug Conner into the kitchen, retrieved a pair of gloves, and continued to choke Conner from the front, around his throat. Conley choked Conner for approximately twenty minutes total.

Conley next got a plastic bag from a drawer in the kitchen and placed it over Conner's head. Conley used black electrical tape to secure the bag by wrapping the tape around Conner's head. Conner was still alive. In fact, Conner's last words were "Andrew stop."

Conley then drug Conner's body to the steps that lead to the basement, drug him down the steps by his feet, across the floor, and outside the home. Conley slammed Conner's head on the concrete multiple times to ensure Conner was dead and then placed his body in the trunk of his car. Conley cleaned himself up and put on new clothes. He put the bloody clothes in his closet and hid the bloody gloves in a chair.

Conley next drove to his girlfriend's house. While there they watched a movie, and he gave her a "promise ring." Conley's girlfriend testified at the sentencing hearing that Conley

2

was "[h]appier than I'd seen him in a long time." Conley spent two hours at his girlfriend's house, while Conner's body remained in the trunk of the car. After leaving his girlfriend's house, Conley drove to an area behind the Rising Sun Middle School. Conley decided to drag Conner's body into the woods and covered the body with sticks and vegetation.

Conley returned home during the early morning hours on Sunday the 29th when no one was home. He cleaned up the blood in the house. When his father returned home around 2:30 a.m., Conley was acting normal. Conley said that Conner was at his grandmother's house and Conley also asked his father for some condoms.

Conley's mother arrived home around 5:45 a.m., and Conley and his mother had popcorn, watched a movie together, and cracked jokes back and forth. His mother fell asleep. On two occasions that early morning, Conley went into his father's bedroom and stood over him with a knife. Conley said he had the intent to kill his father, but he decided not to.

Later that same Sunday, Conley watched football with his father. Following football, Conley left home and drove to the park in Rising Sun where Conner's body had been discarded, but he never went to the actual location. Instead, Conley spoke to two friends and told him that he had killed Conner. Thereafter, around 8:00 p.m., Conley drove his car to the Rising Sun Police Department and voluntarily reported he "accidentally killed his brother" or that he "believed" he had killed his brother.

The police contacted Conley's parents, and after consulting with his parents and waiving his right to counsel, Conley confessed to intentionally killing his ten-year-old brother. Conley was charged with murder and ultimately pleaded guilty, without a plea agreement. The penalty phase of the trial was conducted from September 15 to 21. Following the sentencing hearing, the trial court sentenced Conley to life imprisonment without the possibility of parole.

We are confronted with four issues raised by Conley. The first issue is whether the trial court erred in allowing the testimony of Dr. James Daum. Dr. Daum's testimony did not provide an opinion that Conley had any psychopathy, but instead his testimony suggested Conley had traits of a person with such a diagnosis. The second issue is whether the trial court properly weighed the aggravating and mitigating factors in this case. The third issue raised on appeal is

3

whether Conley's sentence was appropriate under Indiana Appellate Rule 7(B). Finally, we address an issue that was first raised at oral argument,[1] in which we had the parties amend their briefs to address whether the imposition of a life-without-parole sentence on a person under the age of eighteen who has been convicted of murder violated either the United States or Indiana Constitution.

## I. Testimony of Dr. James Daum

A sentence of life without parole (LWOP) is subject to the same statutory standards and requirements as the death penalty. Krempetz v. State, 872 N.E.2d 605, 613 (Ind. 2007). Before a life-without-parole sentence can be imposed, the State is required to prove beyond a reasonable doubt at least one aggravating circumstance. Ind. Code § 35-50-2-9 (2008). The trial court must determine if the State has proven the existence of an alleged aggravator beyond a reasonable doubt, but also that the mitigating circumstances are outweighed by the aggravating circumstances. Id. § 35-50-2-9(l). The penalty phase of an LWOP trial requires introduction of evidence with the burden on the State to prove its case beyond a reasonable doubt. Dumas v. State, 803 N.E.2d 1113, 1121 (Ind. 2004). The admission or exclusion of evidence rests within the sound discretion of the trial court, and we review for an abuse of discretion. Goodner v. State, 685 N.E.2d 1058, 1060 (Ind. 1997). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001). The trial court's decision will not be disturbed absent a requisite showing of abuse. Goodner, 685 N.E.2d at 1060.

In the defendant's presentation to the court, Dr. Connor testified that he diagnosed Conley as having schizoaffective disorder, the bipolar type, and a sleep disorder. Dr. James Daum was called by the State in rebuttal during the penalty phase of the trial to rebut the testimony of defendant's expert, Dr. Connor, that Conley did not "fit the psychotic personality." In preparation for his testimony, Dr. Daum reviewed statements by Conley, Conley's parents, Conley's girlfriend, and police reports. Dr. Daum also reviewed cell phone records, all of the statements Conley made to the police, and reports submitted by the three psychologists who

---

[1] We thank Indiana University-South Bend for its hospitality in hosting us. We also acknowledge the advocacy of Deputy Attorney General Henry Flores Jr., and Appellant's counsel Leanna Weissmann, who drove from Lawrenceburg, Indiana to participate. The Supreme Court thanks you.

4

evaluated Conley, two of which were appointed by the court, and one retained by the defendant. Dr. Daum testified Conley had evidence of psychopathy. The trial court ruled Dr. Daum was not able to testify as to his opinion whether Conley was a psychopathic personality. The specific line of questioning is as follows:

> QUESTION: And are psychopathic personalities difficult to rehabilitate?
>
> WATSON: Objection. Objection, Your Honor. I believe it's improper for any of these folks to render opinion on rehabilitation. That's unnecessary speculation, Your Honor, that my client (indiscernible)
>
> COURT: Okay. That objection is sustained. And I will also note – I do not believe that this witness has rendered an opinion of psychopathy. I believe this witness has only testified regarding characteristic thus far. Okay? Objection is sustained.

Furthermore, the trial court would later explain in announcing his sentence,

> Examinations were conducted by Court appointed experts, Dr. Don Olive and Dr. George Parker, following Defendant[']s filing of an insanity plea. Defendant was also examined by Dr. Edward Conner, defense expert and State's expert, Dr. James Daum did not examine the Defendant but reviewed other records and reports. Dr. Olive concluded that Defendant was suffering from a major depressive order of at least moderate severity; personality disorder, either anti-social personality or borderline personality disorder. Dr. Connor's diagnosis is that Defendant is suffering from schizoaffective disorder – bipolar type. Dr. Parker diagnosed Defendant with depression with psychotic features. Dr. Daum indicated that Defendant exhibited some characteristics of a psychopath. Dr. Daum, however, was not able to render a specific diagnosis because he did not personally examine the Defendant. All experts agree that Defendant, Andrew Conley, understood the wrongfulness of his actions and is criminally responsible. As to Conley's mental state at the time of the offense, Dr. Connor stated "his executive functioning was not suspended and he was able to make rational decisions."

In Bivins v. State, 642 N.E.2d 928, 955–956 (Ind. 1994), this court held only evidence relevant to the charged statutory aggravators can be admitted and considered in capital cases so as to avoid disproportionate sentences in violation of Article 1, Section 16 of the Indiana Constitution. When a sentence of life without parole is sought, courts must limit the aggravating circumstances eligible for consideration to those specified in statute. Cooper v. State, 854 N.E.2d 831, 840 (Ind. 2006). The only evidence relevant to the court is evidence of aggravating and mitigating circumstances. Bivins, 642 N.E.2d at 957. We disagree with defense counsel's

5

characterization that the State used Dr. Daum's testimony to speak of Conley's future dangerousness in violation of <u>Bivins</u>. Dr. Daum testified only on rebuttal, for the purpose of rebutting the defense expert Dr. Connor, that defendant did not "fit the psychotic personality." In fact, the trial court expressly stated on objection, "Counsel, I'm taking this as rebuttal of Dr. Connor. . . . Not this witness rendering his own opinion as to psychopathy." Dr. Daum's testimony was based on Conley's proferred mitigating circumstance of his mental health.

In addition to challenging the substance of the testimony, defense counsel also challenges the relevance of Dr. Daum's testimony. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Again, Dr. Daum's testimony was offered to rebut the testimony of Dr. Connor that Conley did not "fit the psychotic personality." Rebuttal evidence "is limited to that which tends to explain, contradict, or disprove evidence offered by the adverse party." <u>Schwestak v. State</u>, 674 N.E.2d 962, 964 (Ind. 1996) (quoting <u>Isaacs v. State</u>, 659 N.E.2d 1036, 1041 (Ind. 1995)). Defense counsel couches its argument as if Dr. Daum proffered an opinion on Conley's psychopathy. Dr. Daum did no such thing. Dr. Daum's testimony was limited to explaining and contradicting evidence offered by Conley relating to his mental health. We certainly can find no abuse of discretion on the trial court's behalf in allowing this testimony.

Finally, we recognize that Dr. Daum's testimony was given before the trial court and not a jury. We presume the trial judge is aware of and knows the law and considers only evidence properly before him or her in reaching a decision. <u>Emerson v. State</u>, 695 N.E.2d 912, 917 (Ind. 1998). The risk of prejudice is quelled when the evidence is solely before the trial court. <u>Id.</u> In this case, the trial court never mentioned Dr. Daum's testimony as a basis for repudiating any of Conley's proffered mitigators. Furthermore, the trial court recognized that it was not permitted to consider any aggravator other than the victim's age. Dr. Daum did not offer an opinion on Conley's psychopathy, or future dangerousness, and the trial court did not find such to be the case. We hold the trial court exercised proper discretion in permitting Dr. Daum's limited testimony.

## II. Weighing the Aggravating and Mitigating Factors

Defense counsel next argues the trial court improperly weighed the aggravating and mitigating factors. When imposing a sentence of life without parole, the trial court's sentencing statement

(i)      must identify each mitigating and aggravating circumstance found,

(ii)     must include the specific facts and reasons which lead the court to find the existence of each such circumstance,

(iii)    must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, and

(iv)    must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

Krempetz v. State, 872 N.E.2d 605, 613–14 (Ind. 2007) (quoting Dumas v. State, 803 N.E.2d 1113, 1122–23 (Ind. 2004)). Additionally, before the trial court may impose a sentence of life without parole, "it must find that the State has proven the existence of an alleged aggravator beyond a reasonable doubt and must find that 'any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.'" Id. (citing I.C. § 35-50-2-9(l)(2)). This Court gives "great deference to a [trial] court's determination of the proper weight to assign to aggravating and mitigating circumstances." Id. This Court will "set aside the court's weighing only upon the showing of a *manifest* abuse of discretion." Id. The determination that a circumstance is mitigating is within the trial court's discretion, and the trial court is not obligated to explain its reasoning. Dunlop v. State, 724 N.E.2d 592, 597 (Ind. 2000). The trial court is not required to give the same weight as the defendant would give to the proferred mitigating circumstances. Id.

One permissible aggravating factor is the age of the victim. Indiana Code § 35-50-2-9(b)(12). An aggravating factor is the murder victim being less than twelve years of age. In this case, the State alleged as its aggravating factor Conner's young age when he was murdered. Conley does not deny that Conner was only ten years old when he died. The legislature's decision to include age as an aggravator reflects the legislature's policies of both increased protection of young children and a harsher punishment for those who prey on them. Stevens v.

7

State, 691 N.E.2d 412, 432–33 (Ind. 1997). Because the State has proven beyond a reasonable doubt one aggravating factor, and because only one aggravating factor is necessary, we now turn to the second prong, the issue of mitigators.

Conley raised a number of mitigating factors. I.C. § 35-50-2-9(c). The trial court weighed five mitigating factors. The trial court gave some weight to four of the mitigators. The trial court gave no weight to two of the mitigators.

Conley was seventeen-and-a-half-years-old when he murdered Connor. This is a mitigating factor. Indiana Code § 35-50-2-9(c)(7). The trial court gave this "some" weight, but found that he functioned in the normal range of intelligence and had an above average verbal IQ of 118. We find no abuse of discretion in the weight assigned to this mitigating circumstance. Conley was nearly eighteen years of age and functioned at a normal intelligence level.

Conley had no criminal history. This is a mitigating factor. I.C. § 35-50-9-2(c)(1). Again, the trial court gave this "some" weight but noted Conley admitted to smoking marijuana and drinking alcohol. We believe the trial court properly weighed this factor. See Krempetz, 872 N.E.2d 605 (Ind. 2007); Losch v. State, 834 N.E.2d 1012, 1013 (Ind. 2005). In Losch, the trial court noted the defendant's lack of any adult criminal convictions would be a substantial mitigating factor, but were properly given only minimal weight when it was taken into account that the defendant continuously used marijuana since age thirteen and stole money from his family. 834 N.E.2d at 1014. Similarly, in Krempetz, the defendant had no adult convictions, but that was discounted because of defendant's drug use and stealing. 872 N.E.2d at 614. Again, we find no abuse of discretion in the weight assigned by the trial court. Conley's lack of criminal history was offset by his actual criminal behavior of smoking marijuana and drinking alcohol.

The next proffered mitigator was Conley's mental or emotional health. I.C. § 35-50-2-9(c)(2). The trial court gave limited weight to Conley's mental or emotional disturbance when he carried out the murder. The trial court must consider several factors in determining what weight to give to evidence of mental illness. Krempetz, 872 N.E.2d at 615. The trial court must consider "(1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission

8

of the crime." Id. (citing Archer v. State, 689 N.E.2d 678, 685 (Ind. 1997)). In this case, all three doctors who testified confirmed that Conley "understood the wrongfulness of his actions and is criminally responsible." The trial court noted inconsistencies in Conley's statements. Conley told some doctors he suffered from hallucinations but denied that to another. Conley told Dr. Parker he used gloves during the murder because he could not handle touching Conner and placed a bag over Conner's head to avoid looking at him. Conley told police he used gloves and the bag to lessen fingerprints and blood.

Conley's story was also inconsistent when he told Dr. Parker that no one knew of his suicide attempts, but Conley told Dr. Olive his parents knew. The trial court also noted Conley's mother testified that Conley's cuts in a claimed suicide attempt were superficial, and no electrical breakers tripped in another alleged suicide attempt of placing a space heater in a bathtub. In another example, Conley denied to all three doctors to ever being sexually molested, but the week before trial Conley told Dr. Conner he had been. We find no abuse of discretion in the trial court's weighing of this factor.

Conley also argues no weight was given to his lack of capacity to appreciate the criminality of conduct. In fact, the trial court found just the opposite, that Conley indeed did have the capacity to appreciate the criminality of his conduct, and thus gave no weight to the mitigator. The trial court relied, in part, on the testimony of defense expert Dr. Conner, who concluded that "at the time of the crime his executive functioning was not suspended and he was able to make rational decisions." Krempetz is on point in giving minimal weight to defendant's mental condition when (1) there was no evidence defendant had an inferior intellect, (2) defendant was able to fully function on a daily basis, (3) defendant accepted full and complete responsibility for his commission of the offense of murder by entering a plea of guilty, (4) defendant self medicated with marijuana, and (5) the doctor testified that defendant was manipulative and deceptive. 872 N.E.2d at 615. Again, we find no abuse of discretion.

Finally, the statute provides for "other circumstances appropriate for consideration." I.C. § 35-50-2-9(c)(8). The trial court next gave "some" weight to Conley's cooperation with authorities, reasoning the crime would be easily discovered regardless of Conley's confession.

9

However, the trial court gave no weight to Conley's remorse as a mitigating factor, finding it to be "superficial given the horrendous nature of the crime."

Judge Humphrey gave a detailed appraisal of each mitigating circumstance as he weighed them against the sole aggravator of Conner's youth. We find the trial court was within its sound discretion in ultimately concluding that the aggravating factor outweighed the mitigating factors. We find the trial court's sentencing statement, spanning thirty pages, was detailed and explained its rationale for awarding weight, or affording no weight, to each and every mitigating circumstance proffered by Conley. Again, the standard of review is a manifest abuse of discretion. Covington v. State, 842 N.E.2d 345, 348 (Ind. 2006). We find no abuse of discretion by the trial court.

It is also appropriate to discuss the Supreme Court's recent decision, Miller v. Alabama, 132 S.Ct. 2455 (2012). The Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" Miller 132 S.Ct. at 2460. The Court's opinion discusses "two strands of precedent reflecting our concern with proportionate punishment." Id. at 2463. The first strand of precedent the Supreme Court refers to is the Graham and Roper line of cases, respectively providing that the Eighth Amendment bars capital punishment for juveniles, and prohibits a sentence of life without the possibility of parole for juveniles who committed nonhomicide offenses. Id. at 2458. The most fundamental take away from Graham was that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." Id. This strand, the Supreme Court writes, is focused on the sentencer taking into account youth. "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." Id. at 2466.

The second strand of precedent references the body of law that has held mandatory death sentences violate the Eighth Amendment. In these cases, the Supreme Court noted it was especially important that the sentencer have the opportunity to consider the "mitigating qualities of youth." Miller, 132 S.Ct. at 2467 (quoting Johnson v. Texas, 509 U.S. 350, 367 (1993)).

These two strands lead us to find that imposing a mandatory life-without-parole upon a juvenile precludes the sentencer from taking into account the defendant's youth and various issues related to defendant's youth, such as a "failure to appreciate risks and consequences." Id. at 2468. The Supreme Court further wrote that they would require a sentencer "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. at 2469. We hold that Judge Humphrey did just that in the present case. Finally, we note the Supreme Court mentioned Indiana as being one of fifteen jurisdictions where life without parole for juveniles was discretionary, and therefore not unconstitutional in violation of the Eighth Amendment. Id. at 2472 n.10.

### III. Indiana Appellate Rule 7(B)

A sentence authorized by statute can be revised where it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Appellate Rule 7(B) analysis is not to determine "whether another sentence is more appropriate" but rather "whether the sentence imposed is inappropriate." King v. State, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). It is not a matter of second guessing the trial court sentence. Sentence review under Appellate Rule 7(B) is very deferential to the trial court. Felder v. State, 870 N.E.2d 554, 559 (Ind. Ct. App. 2007). The burden is on the defendant to persuade the appellate court that his sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Therefore, when reviewing a sentence, our principal role is to "leaven the outliers" rather than necessarily achieve what is perceived as the "correct" result. Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate. King, 894 N.E.2d at 268.

The nature of the offense is a crime of unimaginable horror and brutality. While babysitting his little brother, a nearly eighteen-year-old murdered his ten-year-old brother, with his bare hands. Conley was in a position of trust over his brother. He murdered his little brother in the very place Conner should have felt the safest. Conner was choked from behind until he passed out, bleeding from the mouth and nose. Conner was still alive as Conley drug him into the kitchen, put on gloves, and for a second time choked Conner. The choking went on for approximately twenty minutes. Conner was still alive. Conley placed a bag over Conner's head.

11

Conner ultimately died due to this asphyxiation. Conley drug Conner's body down a set of stairs, slamming the head on concrete to ensure Conner was dead. Conner's dying words were "Andrew stop."

This was a drawn out crime. Conner suffered unimaginable horror. Conley had opportunities to stop murdering his brother with his own hands. Conley had a number of opportunities to stop his actions and get medical help for Conner. Instead, he continued. This was not a nearly instantaneous death by a bullet. This was death by the hands of the person in charge of protecting Conner. The brutal nature of this crime does not move this Court to believe the sentence is inappropriate.

Defendant claims he should be given leniency due to his alleged mental illness. Following five days of testimony and one-hundred-fifty-five exhibits, the trial court determined that Conley's mental health was not as dire or disturbed as the defendant claimed. Instead, the evidence suggests a hardened character. Speaking with his parents following the murder of his brother, Conley went about a normal day, even asking his father for a condom. Conley seemed happy. This is in line with the doctors who testified at the trial. While Conley may have had some mental or emotional disturbance, he still retained the mental capacity to control his conduct. Conley visited with his girlfriend, even giving her a promise ring, while Conner lay dead in the trunk of the car. Conley watched football the following day. It was not until after Conley was told to go pick Conner up from his grandmother's house, that the reality began to set in. Conley had no escape, no way of avoiding what he had done. The sentence of life without parole was appropriate in light of the defendant's character and the nature of this offense.

### IV. Constitutional Implications of LWOP for a Seventeen-Year-Old

The constitutionality of statutes is reviewed de novo. State v. Moss-Dwyer, 686 N.E.2d 109, 110 (Ind. 1997). Such review is "highly restrained" and "very deferential," beginning "with [a] presumption of constitutional validity, and therefore the party challenging the statute labors under a heavy burden to show that the statute is unconstitutional." Id. at 111–12. The United States Supreme Court has held it is cruel and unusual punishment for an individual under the age of eighteen to be sentenced to life without parole for a non-homicide crime. Graham v. Florida, 130 S. Ct. 2011 (2010). As we mentioned above, the Supreme Court recently decided Miller v.

Alabama, holding a mandatory sentencing scheme of life-without-parole for juveniles is unconstitutional under the Eighth Amendment.[2]

In order to determine whether a punishment is cruel and unusual, the Supreme Court "look[s] beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." Graham, 130 S. Ct. at 2021 (internal quotations omitted). "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." Trop v. Dulles, 356 U.S. 86, 100 (1958) (plurality opinion). The applicability of what is cruel and unusual punishment changes "as the basic mores of society change." Kennedy v. Louisiana, 554 U.S. 407, 419 (2008).

We first note that Conley was born on May 14, 1992, and he murdered his brother on November 28, 2009. He was seventeen years, six months, and two weeks old. He pleaded guilty on September 13, 2010, and was sentenced on October 15, 2010, at the age of eighteen years and five months. Our review of other states reveals that the overwhelming majority provide for the possibility of LWOP sentences to individuals under the age of eighteen.[3] These decisions have been made by the legislature. The legislature has made a policy decision that this is what we want to do. The Eleventh Circuit has written, "the death penalty is not required to deter juveniles from committing murder because a life without parole sentence is deterrence enough, particularly for a juvenile." Loggins v. Thomas 654 F.3d 1204, 1223 (11th Cir. 2011). In Roper v. Simmons, 543 U.S. 551 (2005), the United States Supreme Court held that it was cruel and unusual punishment to sentence an individual under the age of eighteen to death. However, Roper recognized that life without parole was still a viable sentence for juveniles, noting the LWOP sentence was a severe enough sanction to not need the death penalty for juveniles. 543 U.S. at 572. The implication of Roper, then, is that a sentence of life without parole for a

---

[2] We held Oral Argument on November 14, 2011, at Indiana University South Bend. The Eighth Amendment Constitutional issue had not been briefed by either party. We asked the parties to amend their briefs to address this issue. Briefing was completed February 28, 2012.

[3] Only Alaska, Colorado, Kansas, Kentucky, Maine, Montana, New Mexico, New York, Oregon, Texas, and West Virginia do not allow for LWOP sentences for those under the age of 18. National Conference of State Legislatures, Juvenile Life Without Parole (JLWOP), February 2010, (available at www.ncsl.org/documents/cj/jlwopchart.pdf) (last viewed June 27, 2012).

juvenile convicted of homicide is constitutional. Loggins v. Thomas, 654 F. 3d 1204, 1222 (11th Cir. 2011). Recent opinions have been handed down by Nebraska,[4] and Missouri[5] upholding as constitutional an LWOP sentence to a juvenile who commits murder under the United States Constitution and their state constitutions.

As other states have held, and we agree, defendant's Roper and Graham analysis is flawed because "Roper expressly and Graham implicitly recognize that life without parole is not cruel and unusual punishment for a minor who is convicted of a homicide." Missouri v. Andrews, 329 S.W.3d 369, 376–77 (Mo. 2010). As Justice Zel Fischer wrote,

> In Roper, the Court responded to the argument that the possibility of the death penalty was necessary to deter minors from committing homicides by noting that the punishment of life without parole is a severe enough sanction to serve as deterrence. 543 U.S. at 572, 125 S. Ct. 1183. In Graham, the Court recognized that a line existed "between homicide and other serious violent offenses against the individual." 130 S. Ct. at 2027 (internal citations omitted). Defendants who commit nonhomicide offenses, therefore, are "categorically less deserving of the most serious forms of punishment than are murders." Id. Even defendants who commit crimes that cause serious bodily harm to another individual cannot be compared to murders with regard to the severity and irrevocability of their crimes. Id. By illustrating the differences between all other juvenile criminals and murderers, the Court implies that it remains perfectly legitimate for a juvenile to receive a sentence of life without parole for committing murder. 130 S. Ct. at 2027. The chief justice further notes that there is "nothing inherently unconstitutional about imposing sentences of life without parole on juvenile offenders." 130 S. Ct. at 2041 (Roberts, C.J., concurring).

Andrews, 329 S.W.3d at 377.

The Missouri opinion further notes that there are many cases prior to Roper and Graham that hold a life without parole sentence for a juvenile homicide offender would not violate the Eighth Amendment, and the following post-Roper cases continue to hold a life without the possibility of parole sentence for a juvenile homicide offender continues to be constitutionally permissible: State v. Pierce, 225 P.3d 1146, 1147 (Ariz. Ct. App. 2010) (stating that in Roper, "[t]he [Supreme] Court expressly intimated that a natural life sentence for a juvenile who committed murder is not unconstitutionally cruel and unusual"); State v. Allen, 958 A.2d 1214,

---

[4] State v. Golka, 796 N.W.2d 198 (Neb. 2011).

[5] Missouri v. Andrews, 329 S.W. 3d 369 (Mo. 2010).

14

1236 (Conn. 2008) ("The courts are in consensus, however, that the United States Supreme Court clearly has signaled that [a life without parole] sentence [for a juvenile offender] does not violate the [E]ighth [A]mendment."); Wallace v. State, 956 A.2d 630, 641 (Del. 2008) (concluding that "the United States Supreme Court, in Roper, would not have recognized a sentence of life without parole as an acceptable alternative to death as a punishment for juveniles who commit intentional Murder in the First Degree, if such a sentence would violate the Eighth Amendment."). And we further underscore our analysis of the Supreme Court's recent decision in Miller v. Alabama and note it deals solely with the issue of mandatory sentencing schemes requiring life-without-parole for juveniles. In fact, as the Supreme Court specifically noted Indiana was one of fifteen states where life without parole was discretionary. As they wrote,

> According to available data, only about 15% of all juvenile life-without-parole sentences come from those 15 jurisdictions, while 85% come from the 29 mandatory ones. See Tr. Of Oral Arg. In No. 10-9646, p. 19; Human Rights Watch, State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP), Oct. 2, 2009, online at http://www.hrw.org/news/2009/10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole (as visited June 21, 2012, and available in Clerk of Court's case file). That figure indicates that when given the choice, sentencers impose life without parole on children relatively rarely. And contrary to The Chief Justice's argument, see post, at 2462, n. 2, we have held that when judges and juries do not often choose to impose a sentence, it at least should not be mandatory. See Woodson v. North Carolina, 428 U.S. 280, 295–296 (1976) (plurality opinion) (relying on the infrequency with which juries imposed the death penalty when given discretion to hold that its mandatory imposition violates the Eighth Amendment).

Miller, 132 S.Ct. at 2472 n.10. Our holding that the life without parole sentence is not unconstitutional is not altered by Miller.

We now turn to the state constitutional analysis. The Indiana Constitution can provide more protections than the United States Constitution provides. Justice v. State, 552 N.E.2d 844, 847 (Ind. Ct. App. 1990). Our Constitution provides in pertinent part "Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense." Ind. Const. art. 1, § 16. "The penal code shall be founded on the principles of reformation, and not of vindictive justice." Ind. Const. art. 1, § 18. Although the language is not the same as the United States Constitution, the protections are the same.

"The constitutional prohibition against cruel and unusual punishments proscribes atrocious or obsolete punishments and is aimed at the kind and form of the punishment, rather than the duration or amount." Dunlop v. State, 724 N.E.2d 592, 597 (Ind. 2000). The punishment will be deemed cruel and unusual under Article 1, Section 16 "if it makes no measurable contribution to acceptable goals of punishment, but rather constitutes only purposeless and needless imposition of pain and suffering." Id. (internal citations and quotations omitted). "[L]ife imprisonment without parole does not constitute cruel and unusual punishment." Id.

Conley correctly points out that he is only the fourth juvenile sentenced to a life-without-parole sentence, following Daniel Boyd,[6] sentenced in 1997 for killing a sixty-five-year-old man; Larry Newton,[7] sentenced for the 1994 murder of a Ball State student; and Greg Dickins,[8] sentenced in 2001 after shooting a police officer. Life without parole is reserved for use in only the most heinous of crimes that so shock our conscience as a community. If retribution was the goal, as Conley has stated, life without parole would be far more frequently used in Indiana. We hold that life without parole is not an unconstitutional sentence under the Indiana constitution under these circumstances.

---

[6] Conley cites Boyd as being one of three juveniles serving such a sentence. Conley cites no authority, and a search returns no appellate citation to a Daniel Boyd. Perhaps Boyd accepted a plea agreement in lieu of the prosecution dismissing the death penalty. A review of the Indiana Department of Correction Offender Date shows Boyd was born October 17, 1977, and was sentenced for murder to life without parole on June 27, 1997. See Indiana Department of Correction Offender Data (available at www.in.gov/apps/indcorrection.ofs), (last visited June 27, 2012). Boyd was likely near the age of eighteen when the murder was committed.

[7] On September 24, 1994, Larry Newton and friends were drinking in a graveyard near Ball State's campus. Newton decided he wanted to go to campus and rob someone and stated, "I'm hyped and I feel like killing somebody." Once there, Newton and friends found a male returning from walking a female friend home. Newton shot the male in the back of the head. Turner v. State, 682 N.E.2d 491, 493–494 (Ind. 1997); Newton v. State, 894 N.E.2d 192 (Ind. 2008). Newton's date of birth is November 9, 1976, and the crime occurred on September 24, 1994, making Newton seventeen and ten months of age at the time the crime occurred. See Indiana Department of Correction Offender Data (available at www.in.gov/apps/indcorrection/ofs), (last visited June 27, 2012).

[8] In 1997, a sixteen-year-old Dickens was riding his bike with a friend when the officer observed Dickens riding a potentially stolen bike. The officer approached them in his patrol car, and they fled to a home. The officer followed Dickens onto the porch, and Dickens shot the officer in the head, killing him. Dickens v. State, 754 N.E.2d 1, 3–4 (Ind. 2001).

16

**Conclusion**

The heinous facts of this crime are difficult to comprehend. A seventeen-and-a-half-year-old caring for his ten-year-old brother murdered the defenseless child with his bare hands. After disposing of the body, Conley acted as if nothing was out of the ordinary. He took steps to cover up the crime and hid his brother's body in a park. The aggravating factor was clearly established and uncontroverted. The judge was within his discretion in weighing the mitigating factors in the manner in which he did. Ultimately, we find no abuse of discretion in Judge Humphrey's analysis of those factors and ultimate sentence of life without parole. Also, the trial court did not abuse its discretion in admitting the testimony of Dr. Daum. Finally, the imposition of life without parole to a convicted murderer under the age of eighteen in Indiana is in line with the rest of the nation in holding such a sentence is constitutional. We affirm Conley's sentence of life without parole.

Dickson, C.J., and Massa, J., concur.

Rucker, J., dissents with separate opinion in which Sullivan, J., concurs.

**Rucker, J., dissenting.**

At the age of seventeen Andrew Conley murdered his ten-year-old brother. I agree with the majority that Dr. Daum's testimony was properly admitted and I do not believe the trial court manifestly abused its discretion in weighing aggravating and mitigating circumstances in this case. However, I do not agree Conley should have been sentenced to die in prison. Therefore I respectfully dissent.

The United States Constitution prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. Such punishment is an excessive sanction violating the "basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." Miller v. Alabama, No. 10-9646, slip op. at 6 (U.S. June 25, 2012) (quoting Roper v. Simmons, 543 U.S. 551, 560 (2005)). Whether a juvenile's sentence of life without parole constitutes "cruel and unusual punishment" is an issue of national and international import as well as the subject of much scholarly literature. See generally, e.g., Miller, No. 10-9646; Connie de la Vega & Michelle Leighton, Sentencing Our Children to Die in Prison: Global Law and Practice, 42 U.S.F.L. Rev. 983 (2008). To determine whether a punishment violates the Eighth Amendment, courts must look beyond historical conceptions to "the evolving standards of decency that mark the progress of a maturing society." Graham v. Florida, 130 S. Ct. 2011, 2021 (2010) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)).[9]

---

[9] Like the U.S. Constitution, the Indiana Constitution also prohibits cruel and unusual punishment. See Ind. Const. art. 1, § 16 ("Cruel and unusual punishments shall not be inflicted."). Protections afforded under Indiana's Constitution are not necessarily coextensive with those provided by the Federal Constitution, and our analysis of many Constitutional issues frequently does not follow in lockstep with the federal analysis. See, e.g., Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005) (applying different analysis for reasonableness of a police search); Collins v. Day, 644 N.E.2d 72, 75 (Ind. 1994) (identifying independent analyses for Indiana Privileges and Immunities and Federal Equal Protection clauses). "Punishment is cruel and unusual under Article 1, Section 16 if it makes no measurable contribution to acceptable goals of punishment, but rather constitutes only purposeless and needless imposition of pain and suffering." Dunlop v. State, 724 N.E.2d 592, 597 (Ind. 2000) (internal quotations omitted). Further, "[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice." Ind. Const. art. 1, § 18. This Court has held that life imprisonment without parole is not per se cruel and unusual punishment. Dunlop, 724 N.E.2d at 597. But prior to this case we have never considered specifically whether life imprisonment without parole may be unconstitutional as applied to juveniles.

When examining a punishment for categorical compliance with the Eighth Amendment, the Supreme Court exercises its "own independent judgment whether the punishment in question violates the Constitution," Graham, 130 S. Ct. at 2022, and considers "'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." Id. (quoting Roper, 543 U.S. at 563-64).

Employing this analysis, the Supreme Court has held death sentences for those under the age of eighteen violate the Eighth Amendment, Roper, 543 U.S. at 568, and has held life without parole sentences for juveniles committing crimes other than homicide to be similarly offensive, Graham, 130 S. Ct. at 2030.[10] And the Supreme Court very recently held that sentencing schemes mandating life without parole for those under the age of 18 at the time of their crimes – including homicide crimes – violate the Eighth Amendment, because a juvenile has "'lessened culpability' and greater 'capacity for change,'" and because precedent requires "individualized sentencing for defendants facing the most serious penalties." Miller, No. 10-9646, slip op. at 1-2 (quoting Graham, 130 S. Ct. at 2026, 2030).[11] Based on the reasoning advanced in these cases, Conley argues that any sentence of life without parole for all juvenile offenders is unconstitutional, even for those who commit homicide.

The Supreme Court has found even where a majority of jurisdictions may statutorily permit a particular sentence, "an examination of actual sentencing practices" may "disclose[] a consensus against its use." Graham, 130 S. Ct. at 2023. In Miller, the Supreme Court identified Indiana as one of fifteen states permitting discretionary life without parole sentences for juveniles. And as the Miller Court noted, in jurisdictions where juvenile life without parole sentences are discretionary, such sentences are unusual. Miller, No. 10-9646, slip op. at 21-22 n.10. ("[W]hen given the choice, sentencers impose life without parole on children relatively

---

[10] Roper concerned a seventeen-year-old sentenced to death for planning and executing a horrifying crime that included burglary, kidnapping, and murder. Roper, 543 U.S. at 556-57. Graham involved a sixteen-year-old sentenced to life without parole for first-degree felony armed burglary with assault or battery. Graham, 130 S. Ct. at 2018.

[11] The defendants in Miller were fourteen-year-olds convicted of homicide. Both were sentenced to life without parole under two different mandatory state sentencing statutes.

2

rarely."). Of the 421 juveniles serving life without parole sentences in these states, 348 – 83% – were confined in only four states: Arizona, California, Mississipi, and Oklahoma. See Nat'l Conference of State Legislatures, Juvenile Life Without Parole (JLWOP) (2010), http://www.ncsl.org/documents/cj/jlwopchart.pdf (table of U.S. jurisdictions listing juvenile life without parole sentences by jurisdiction and noting in which jurisdictions life without parole sentences are entirely discretionary). According to Federal Bureau of Investigation statistics, juveniles committed 45,429 murders between 1980 and 2009. See C. Puzzanchera & W. Kang, Easy Access to the FBI's Supplementary Homicide Reports: 1980-2009 (2010), http://ojjdp.gov/ojstatbb/ezashr/ (national homicide database permitting selection of results by age of offender and year of incident). As of February 2010, 2,465 U.S. juveniles were serving life without parole for homicide offenses. See Nat'l Conference of State Legislatures, supra. These numbers, while not providing an exact comparison, tend to confirm that as a matter of overall proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of homicide crimes is quite infrequent – occurring in less than 6% of juvenile homicide prosecutions. Accord Graham, 130 S. Ct. at 2024-25 (analyzing statistics of juvenile life without parole sentences for non-homicide crimes and concluding that "in proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual").

In cases holding certain punishments categorically unconstitutional as to juveniles, the Supreme Court has found confirmation for its judgment on these matters by reviewing accepted practice in the international community. Roper, 543 U.S. at 575. For many years the Court "has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'" Id. And as it relates to juvenile life without parole sentences – even for homicide crimes – "[t]he United States is the only country in the world that does not comply with the norm against imposing life without possibility of parole sentences on offenders who are under the age of 18 at the time of the offense." Brief for Amnesty International, et al. as Amici Curiae Supporting Petitioners, Miller v. Alabama, No. 10-9646 and Jackson v. Hobbs, No. 10-9647, 2012 WL 174238, at *2. According to an article cited by the Supreme Court in Graham, 130 S. Ct. at 2033, "Most governments have either never allowed, expressly prohibited, or will not practice

[life without parole] sentencing on child offenders because it violates the principles of child development and protection established through national standards and international human rights law." de la Vega & Leighton, supra, at 989. In fact, "[t]here are now at least 135 countries that have expressly rejected the sentence via their domestic legal commitments, and 185 countries that have done so in the U.N. General Assembly." Id.

Further, it is notable that exposure of juveniles to life without parole sentences is frequently the result of the increased prevalence of statutes permitting or mandating transfer of juveniles into adult court. See Id. at 991-92. As the Supreme Court has recognized, "transfer laws show 'that the States consider 15-year-olds to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), *but tell[] us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders*.'" Graham, 130 S. Ct. at 2025 (quoting Thompson v. Oklahoma, 487 U.S. 815, 826 n.24 (1988) (plurality opinion) (emphasis in original). See also Miller, No. 10-9646, slip op. at 23. In Conley's case, he was exposed to a life without parole sentence by virtue of Indiana Code section 31-30-1-4(a)(2) which provides: "The juvenile court does not have jurisdiction over an individual [at least 16 years of age] for an alleged violation of . . . IC 35-42-1-1 (murder)."

But the key in the Supreme Court's Eighth Amendment analysis in juvenile cases is its "judicial exercise of independent judgment" which "requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question" together with a determination of whether the sentence at issue serves legitimate penological goals. Graham, 130 S. Ct. at 2026. With respect to juvenile offenders, these inquiries are underpinned by the Supreme Court's repeated recognition that juveniles are less culpable than adults and therefore are less deserving of the most severe punishments. See Id.

The presumption that juveniles are generally less culpable than adults is based on extensive past and ongoing "'developments in psychology and brain science [which] continue to show fundamental differences between juvenile and adult minds'" – for example, in "parts of the

brain involved in behavior control.'" Miller, No. 10-9646, slip op. at 9 (quoting Graham, 130 S. Ct. at 2026). As the Supreme Court has observed, there are "three significant gaps between juveniles and adults." Id. at 8. First, "[a]s compared to adults, juveniles have a 'lack of maturity and an underdeveloped sense of responsibility.'" Graham, 130 S. Ct. at 2026 (quoting Roper, 543 U.S. at 569). Second, "they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure,'" id. (quoting Roper, 543 U.S. at 569), and "they have limited 'control over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." Miller, No. 10-9646, slip op. at 8 (quoting Roper, 543 U.S. at 569). Finally, "a child's character is not as 'well formed' as an adult's . . . and his actions [are] less likely to be 'evidence of irretrievable depravity.'" Id. (quoting Roper, 543 U.S. at 570). "These salient characteristics mean 'it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" Graham, 130 S. Ct. at 2026 (quoting Roper, 543 U.S. at 573). Even justices not finding categorical Eighth Amendment violations in these juvenile cases agree with this precept. See Graham, 130 S. Ct. at 2039 (Roberts, C.J., concurring in the judgment) ("Roper's conclusion that juveniles are typically less culpable than adults has pertinence beyond capital cases."); Roper, 543 U.S. at 599 (O'Connor, J., dissenting) ("It is beyond cavil that juveniles as a class are generally less mature, less responsible, and less fully formed than adults, and that these differences bear on juveniles' comparative moral culpability.").

Using this backdrop, the Supreme Court has recognized that "life without parole is the 'second most severe penalty permitted by law,'" Graham, 130 S. Ct. at 1027 (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment)), and "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." Miller, 10-9646, slip op. at 9. The Miller opinion highlighted how the goals of retribution, deterrence, incapacitation, and rehabilitation are not served by sentencing juveniles to life without parole. See id. at 9-10 (noting that retribution makes less sense the less culpable the offender; deterrence against juveniles has limited effect as the attributes of youth "make them less likely to consider potential punishment"; incapacitation of a juvenile is only justified where

5

the juvenile is incorrigible, and "'incorrigibility is inconsistent with youth'"; the sentence of life without parole "'forswears altogether the rehabilitative ideal'" (quoting Graham, 130 S. Ct. at 2029-30)). As the Court aptly put it in assessing life without parole for juvenile non-homicide crimes: "[T]his sentence 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and the spirit of the [juvenile] convict, he will remain in prison for the rest of his days.'" Graham, 130 S. Ct. at 2027 (quoting Naovarath v. State, 779 P.2d 944, 944 (Nev. 1989)).

The Miller Court limited its holding of unconstitutionality to mandatory juvenile life without parole sentences, stating, "[b]ecause that holding is sufficient to decide these cases, we do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." Miller, 10-9646, slip op. at 17. The thrust behind the Miller holding is that juvenile sentencing decisions must be individualized because, given the diminished culpability of juvenile offenders, there is a greater risk that a life without parole sentence will violate the Eighth Amendment. A sentencing court therefore must consider youth and its attendant characteristics – "and how those differences counsel against irrevocably sentencing [children] to a lifetime in prison." Id.

Conley was not sentenced under a mandatory scheme like those held unconstitutional in Miller. But the Miller decision does not preclude a conclusion that Conley's sentence is unconstitutional. It is the consideration of those very things that a mandatory scheme prohibits – such as the juvenile defendant's abuse by his stepfather, his regular use of drugs and alcohol, and his four suicide attempts, see id., at 4 – that may lead to a conclusion that a particular sentence, when applied to a particular youth, violates the Eighth Amendment. As the Court stated:

> Most fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances there, juvenile status precluded a life without parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. "An offender's age," we made clear in Graham, "is relevant to the Eighth Amendment," and so "criminal

6

procedure laws that fail to take defendants' youthfulness into account at all would be flawed." The Chief Justice, concurring in the judgment, made a similar point. Although rejecting a categorical bar on life-without-parole sentences for juveniles, he acknowledged "<u>Roper</u>'s conclusion that juveniles are typically less culpable than adults," and accordingly wrote that "an offender's juvenile status can play a central role" in considering a sentence's proportionality.

<u>Miller</u>, 10-9646, slip op. at 10-11 (quoting <u>Graham</u>, 130 S. Ct. at 2031; 130 S. Ct. at 2039 (Roberts, C.J., concurring in the judgment)).

In his concurrence in <u>Graham</u>, the Chief Justice applied a "narrow proportionality" review to determine if a life without parole sentence as to Graham in particular violated the Eighth Amendment. The Chief Justice recognized the purpose of such a review is not to "second-guess" the decisions of legislatures or trial courts, as "the Eighth Amendment does not require strict proportionality between the crime and the sentence." <u>Graham</u>, 130 S. Ct. at 2037 (Roberts, C.J., concurring in the judgment) (quoting <u>Ewing v. California</u>, 538 U.S. 11, 23 (2003)). Rather, it "forbids only extreme sentences that are grossly disproportionate to the crime." <u>Id.</u> (quoting Ewing, 538 U.S. at 23). Still, the Chief Justice concluded that based on the juvenile defendant's lack of prior criminal convictions,[12] the "difficult circumstances of his upbringing" (which included his parents' drug addiction in his early years, his diagnosis with attention deficit hyperactivity disorder, and his use at a young age of alcohol, tobacco, and marijuana) and his youth (sixteen at the time of the crime), the sentence of life without parole was likely a grossly disproportionate punishment for his crime of first-degree felony armed burglary with assault or battery. <u>Id.</u> at 2040 (Roberts, C.J., concurring in the judgment). Chief Justice Roberts therefore concurred in the Court's judgment that Graham's sentence was unconstitutional. <u>Id.</u> at 2042 (Roberts, C.J., concurring in the judgment).

As the majority here correctly recognizes, <u>Roper</u>, <u>Graham</u>, and <u>Miller</u> are certainly distinguishable from this case. And though <u>Miller</u>'s holding does not apply here, its admonition

---

[12] Although this was Graham's first conviction, he had acknowledged committing "two or three" other robberies, and was at the time of this conviction also found guilty of a separate home invasion robbery and possessing a firearm. <u>Graham</u>, 130 S. Ct. at 2019. Further, Graham began drinking alcohol and using tobacco at age 9 and he smoked marijuana at age 13. <u>Id.</u> at 2018.

does: "[G]iven all we have said in <u>Roper</u>, <u>Graham</u>, and this decision about children's diminished culpability and heightened capacity for change, *we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon*." <u>Miller</u>, 10-9646, slip op. at 17 (emphasis added). Ultimately I would find it unnecessary to decide this case on Constitutional grounds and would instead exercise this Court's review and revise authority under Appellate Rule 7(B) to reduce Conley's sentence to a term of years.

I agree that the trial court did not manifestly abuse its sentencing discretion in this case.[13] Nonetheless, "[a]lthough a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana constitution 'authorize[] independent appellate review and revision of a sentence imposed by the trial court.'" <u>Anglemyer v. State</u>, 868 N.E.2d 482, 491 (Ind. 2007) (quoting <u>Childress v. State</u>, 848 N.E.2d 1073, 1080 (Ind. 2006)). This authority is implemented through Indiana Appellate Rule 7(B), which allows a court on appeal to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Though we have long recognized that the maximum sentence permitted by law should be reserved for the very worst offenders, <u>Bacher v. State</u>, 686 N.E.2d 791, 802 (Ind. 1997), the purpose of appellate review of sentences is "not to achieve a perceived 'correct' result in each case," but rather to "leaven the outliers." <u>Cardwell v. State</u>, 895 N.E.2d 1219, 1225 (Ind. 2008).[14] Appellate courts are not limited to the statutory mitigators and aggravators when considering a Rule 7(B) claim, but may look to other evidence in the record. See <u>Roney v. State</u>, 872 N.E.2d 192, 206 (Ind. Ct. App. 2007), <u>trans. denied</u>.

---

[13] The Supreme Court in <u>Miller</u> made a point of requiring a juvenile's sentence "to take into account how children are different, *and how those differences counsel against irrevocably sentencing them to a lifetime in prison*." <u>Miller</u>, No. 10-9646, slip op. at 17 (emphasis added). It is not yet clear how this language might apply on appellate Eighth Amendment review of a particular juvenile's sentence. Nevertheless, it seems clear to me that our "manifest abuse of discretion" standard for review of a trial court's weighing of aggravators and mitigators is no substitute for an Eighth Amendment proportionality analysis.

[14] According to the U.S. Department of Justice, less than one quarter of state homicide convictions in the year 2006 resulted in life without parole sentences. <u>See</u> Seth Rosenmerkel, et al., U.S. Dep't of Justice Bureau of Justice Statistics, <u>Felony Sentences in State Courts, 2006 – Statistical Tables</u> at 7 (Table 1.4) (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/fssc06st.pdf. In fact, the median sentence in 2006 for homicide crimes – including those by adult offenders – was twenty-two years. <u>See Id.</u> at 6 (Table 1.3).

As to the nature of the offense, there is no question this was a brutal crime. Conley strangled his younger brother, asphyxiated him by covering his head with a plastic bag, placed him in the trunk of his car, then went to see his girlfriend. But this is not the entire inquiry under Rule 7(B).

When considering Conley's character, the majority focuses on Conley's behavior during the crime and the next day. I would note in this regard that on the day after the murder – before anyone but two of his best friends knew of what happened – Conley drove himself to the police station where he told police he killed his brother. He waived his Constitutional rights[15] and cooperated with police. Conley is very clearly distraught by what he did and cannot understand why he did it. Tr. at 617-18, 704. He even asked the psychologists assessing him after his arrest to help him get the death penalty for his crime. Tr. at 617, 704.

Conley's upbringing was punctuated by his mother's four marriages and the consequent changes in her living arrangements. See Depo. of Bridget Conley at 59-67.[16] Conley's interviews with psychologists after the crime indicated he had attempted suicide at least five times. Tr. at 521, 790. There was evidence of neglect by his mother, Tr. at 834-35, and that one of his stepfathers had anally raped him at age seven or eight. Tr. at 622.[17] Even so, prior to committing this crime Conley had no convictions or juvenile adjudications of any kind. He was

[15] Because Conley was a minor, Conley's mother (also the victim's mother) was required to consent to this waiver, which she did. Tr. at 1022. She has not seen Conley since she became aware of the murder. See Depo. of Bridget Conley at 67.

[16] After the crime, Conley's mother Bridget relocated outside of Indiana and was unavailable for trial. The parties agreed to conduct a deposition of Bridget Conley in lieu of her trial testimony. A video of the deposition was played on the record for the trial court at the sentencing hearing, and a copy of the transcript of the deposition was admitted as Exhibit 498A. See Tr. at 576-81; Depo. of Bridget Conley at 5. Because the actual recording was not transcribed directly into the record, I refer to the Deposition Transcript in lieu of the Sentencing Hearing Transcript.

[17] Conley's counsel found out about the rape because Conley had confided about it to a friend before these events. The friend informed Conley's counsel, who informed Dr. Conner, the consulting psychiatrist. When later asked by Dr. Connor why he hadn't initially disclosed the molestation, Conley responded that "[h]e felt like . . . it was nasty, it was no one's business, it didn't really have anything to do with [these events]." Tr. at 626. In fact, when Dr. Connor asked Conley whether the molestation could be connected to what Conley did to his brother, Conley replied "I don't see how it could be. They are two very different things." Tr. at 623. Dr. Connor found that these responses – and the fact that Conley had not initially tried to use the molestation to his advantage – made Conley's descriptions of this and other events of his childhood "more credible" rather than less so. See Tr. at 623-24.

9

by all accounts a model student and had a "great" relationship with his mother and brother. See Tr. at 821 (testimony of Conley's high school principal); Depo. of Bridget Conley at 6. See also Tr. at 861 (testimony of Marsha Louden noting that the brothers seemed to have a "good relationship" and that Conley consistently made "sure Conner's needs were met"); Tr. at 845 (testimony of Conley's maternal grandmother that "He's always been a good boy," and "He's my best grandchild"). According to Conley's mother, he received As and Bs "without even trying" but she knew he had the ability to get all As if he applied himself. Depo. of Bridget Conley at 7. See also Tr. at 678, 827 (testimony of long-time teachers of Conley's). He had aspirations of going to college, and his best friend's mother had taken him to make campus visits before beginning his senior year of high school. Tr. at 858-59; Appellant's App. at 535.

Then, abruptly about two weeks before killing his brother, Conley revealed to his mother that he wanted to kill himself and had tried to electrocute himself in the family bathtub. Depo. of Bridget Conley at 8, 13. He showed his mother that he had also cut himself all over his chest, arms, stomach and legs. See Depo. of Bridget Conley at 12. See also Tr. at 790 (testimony of Dr. Parker describing Conley's "cutting behavior" and multiple "serious attempts" at suicide). He then told his mother – out of the blue – that he wanted to quit high school, get his GED, and join the National Guard. Depo. of Bridget Conley at 14. Conley's mother interpreted his self-destructive behavior as manipulation to get her to agree to let him quit school. Depo. of Bridget Conley at 16. But Conley's mother stated she "didn't mind" that he wanted to quit school during his senior year, and the next day she took him to withdraw from school, giving her written consent for him to do so. Depo. of Bridget Conley at 14, 19; Appellant's App. at 529. Conley's mother also started searching for a therapist for him. Conley's mother stated that had she any knowledge that he would be a danger to others, she would have "had him committed right away." Depo. of Bridget Conley at 51. But when Conley later expressed interest in returning to school, his mother told him that if he went back to school, the school counselor would commit him to the psychiatric ward. Tr. at 857 (testimony of Marsha Louden).

As the trial court noted in its sentencing order, "All [diagnosing medical experts] agree that the Defendant suffered from a mental disease at the time of the murder." Tr. at 1026. Their specific diagnoses varied, but included significant similarities. See, e.g., Tr. at 606 (Dr.

10

Connor's diagnosis of schizoaffective disorder bipolar type); Tr. at 780-81 (Dr. Parker's diagnosis of depression with psychotic features, with possible bipolar disorder); Tr. at 524 (Dr. Olive's diagnosis of major depressive disorder with symptoms of mixed personality disorder). And Dr. Connor opined that Conley had suffered from mental illness since his pre-adolescent years. Specifically, he found that Conley had an "ongoing and untreated . . . mental health condition" from which he had suffered since approximately age eleven or twelve. Tr. at 615. Dr. Connor further testified that Conley's mental illness affected his "ability to control [his actions] as compared to . . . a person who has no mental health diagnosis." Tr. at 616. Conley's youth, combined with his mental illness, made him even less culpable than the average juvenile. Cf. Graham, 130 S. Ct. at 2027 (relying in part on the "twice diminished moral culpability" of a juvenile who did not intend to kill as compared to an adult murderer in finding life without parole categorically unconstitutional for juveniles convicted of non-homicide crimes).

This Court has recognized that even though evidence of a difficult childhood may not always warrant mitigating weight, "[i]t is of course true that 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" Richie v. State, 875 N.E.2d 706, 725 (Ind. 2007) (quoting Penry v. Lynaugh, 492 U.S. 302, 319 (1989)).[18] And we have previously considered a defendant's mental illness in deciding to reduce a sentence. See, e.g., Reid v. State, 876 N.E.2d 1114, 1117 (Ind. 2007) (citing twenty-two-year-old defendant's "history of mental health problems" in reducing his fifty year sentence for conspiracy to commit murder to the advisory sentence of thirty years); Walton v. State, 650 N.E.2d 1134, 1137 (Ind. 1995) (reducing by half the sentence of a high school junior with diverging mental illness diagnoses for the brutal murders of his adoptive parents). Cf. Carter v. State, 711 N.E.2d 835, 843 (Ind. 1999) (reducing the murder sentence of a juvenile with a behavioral disorder and some childhood abuse from sixty to fifty years under the precursor to Rule 7(B)).

---

[18] And as noted above, the Rule 7(B) analysis is not limited to statutory mitigators.

Finally, Conley was only seventeen at the time of this crime, and I find, as has the Supreme Court, that his age is relevant to the assessment of his character. There is no question that juveniles have developmental issues that reduce their culpability for crimes. In this case, it seems clear that Conley "was still a teenager with a developing brain and impulse control issues made worse by his mental illness." Amended Br. of Appellant at 28.

I disagree with the majority's characterization of Conley's "hardened character." Slip op. at 12. While many juveniles may commit crimes that "reflect[] unfortunate yet transient immaturity," only "the rare juvenile" is capable of committing a crime that "reflects irreparable corruption." See Roper, 543 U.S. at 573. I cannot conclude at this time that Andrew Conley is one of those rare juveniles.[19] For this reason I would revise his sentence to the maximum term of sixty-five years.

Sullivan, J., concurs.

---

[19] As the majority notes, we know the details of the crimes committed by two of the three other Indiana juveniles sentenced to life without parole. One stalked an unsuspecting college student and shot him in the head because "I'm hyped and I feel like killing somebody." See slip op. at 16 n.7. The other shot a police officer in the head after the officer observed him riding a potentially stolen bicycle. Id. at 16 n.8.

12