## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 10 2017, 5:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

J. Clayton Miller
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bert McQueen, III,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 10, 2017<br><br>Court of Appeals Case No.<br>81A04-1602-CR-281<br><br>Appeal from the Union Circuit Court<br><br>The Honorable Matthew R. Cox, Judge<br><br>Trial Court Cause No.<br>81C01-1409-MR-180 |

**Altice, Judge.**

## Case Summary

[1] Following a jury trial, Bert McQueen, III, was convicted of murder, a felony, and obstruction of justice, a Level 6 felony. He then admitted to being a habitual offender. The trial court sentenced McQueen to sixty-three years for his murder conviction. Pursuant to an agreement between McQueen and the State, the trial court sentenced McQueen to a concurrent two-year term for his obstruction of justice conviction and enhanced the murder sentence by six years for the habitual offender adjudication, for a total aggregate sentence of sixty-nine years. On appeal, McQueen argues that his sixty-three-year sentence for murder is inappropriate in light of the nature of the offense and his character.

[2] We affirm.

## Facts & Procedural History

[3] The facts most favorable to the convictions follow. In early September 2014, McQueen lived with his lifelong friend Brandon Wicker while he worked on Wicker's house. In the days leading up to September 5, 2014, a neighbor heard escalating arguments between McQueen and Wicker. McQueen also made statements to a friend that he was going to kill Wicker or "kick his ass" because Wicker apparently owed McQueen money. *Transcript* at 505. In the early evening hours on September 5, 2014, McQueen, who had been working outside, entered Wicker's house, picked up a gun from the table, and aimed it at Wicker. McQueen said "bang" and squeezed the trigger, shooting Wicker in the head from approximately twelve inches away. *Id*. at 567. McQueen observed black blood and saw Wicker fall to the floor. McQueen then fled to a

neighbor's house and did not summon aid or try to help Wicker. A short time later, McQueen returned to Wicker's house. Using a towel, McQueen wiped off the gun and then he wrapped the gun in the towel before throwing it in a nearby river.

[4] Around 8:10 p.m., McQueen arrived at another neighbor's home. After approximately twenty minutes, that neighbor was informed by another that McQueen had shot Wicker. The neighbor questioned McQueen, who admitted what he had done. That neighbor then called the police. When police arrived, McQueen informed them that he had shot Wicker and directed them to Wicker's home. Wicker was discovered lying in a large pool of blood on the kitchen floor. Although emergency personnel observed brain matter coming from the site of the gunshot wound, it was determined that Wicker was still breathing. He was stabilized for transport by helicopter to the hospital, where Wicker was placed on life support. After consulting with doctors about Wicker's condition, Wicker's family made the decision to remove him from life support.

[5] On September 16, 2014, the State charged McQueen with Count I, murder, a felony, and filed a separate information alleging McQueen to be a habitual offender. The State later amended the charging information to add Count II, possession of a firearm by a serious violent felon, a Level 4 felony; County III, reckless homicide, a Level 5 felony; and Count IV, obstruction of justice, a Level 6 felony. The State dismissed Count III prior to trial. On December 8, 2015, a trifurcated jury trial commenced. The jury found McQueen guilty of

Counts I, II, and IV. At the conclusion of the first phase of the trial, the parties filed a Joint Plea and Sentencing Recommendation providing that McQueen would admit to the habitual offender allegation and have his murder sentence enhanced by six years. In exchange, the State agreed to dismiss Count II and that any sentence imposed for Count IV would be served concurrently with the sentence for the murder conviction.

[6] A sentencing hearing was held on January 8, 2016. In sentencing McQueen, the trial court identified two aggravating factors: McQueen's lengthy criminal history, which began at the age of fifteen, and his failure to seek medical treatment for Wicker after he shot him. The trial court gave McQueen some mitigation for remorse but noted "that's not a lot." *Id*. at 713. Finding that McQueen's criminal history is "one that is rarely seen", the trial court determined that an aggravated sentence was warranted. *Id*. at 718. The trial court then sentenced McQueen to sixty-three years for the murder conviction. In accordance with the agreement between McQueen and the State, the trial court also sentenced McQueen to a concurrent two-year term for his obstruction of justice conviction and enhanced the murder sentence by six years for the habitual offender adjudication, for a total aggregate sentence of sixty-nine years. McQueen now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[7] McQueen argues that the sixty-three-year sentence for his murder conviction is inappropriate. Despite the fact that the trial court imposed a sentence that is authorized by statute, we may revise McQueen's sentence if, "after due consideration of the trial court's decision, [we] find that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). Ultimately, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Thus, "whether we regard a sentence as appropriate ... turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224. McQueen bears the burden of persuading our court that his sentence is inappropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012).

[8] McQueen argues that he does not deserve a sixty-three-year sentence for murder because, as the trial court indicated, he is not the "worst of the worst". *Transcript* at 713. The advisory sentence is the starting point the legislature has chosen as an appropriate sentence for the crime committed. *Childress v. State*, 848 N.E.2d 1073, 1081 (Ind. 2006). The maximum possible sentence is generally most appropriate for the worst offenders. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). A murder conviction carries a possible sentence of forty-five to sixty-five years with the advisory sentence being fifty-five years.

Ind. Code § 35-50-2-3. McQueen was sentenced to sixty-three years, two years shy of the maximum. We are thus not inclined to evaluate whether he is the "worst of the worst."

[9] With regard to the nature of the offense, McQueen argues that under the facts of this case, an aggravated sentence is not warranted. McQueen attempts to discount the aggravating factor of his failure to summon aid for Wicker by pointing out that, from his perspective, after he saw black blood come from Wicker's head, he believed Wicker was already dead.[1] McQueen's subjective belief does not change the fact that Wicker was still breathing and left lying in a pool of blood for nearly an hour before a neighbor summoned help. Moreover, we note that during the time McQueen could have been summoning aid, he found the time to try to conceal the crime by wiping his fingerprints from the gun and then throwing the gun in a nearby river.

[10] McQueen also argues that the crime was not particularly gruesome, focusing on the fact that Wicker was not tortured, sexually abused, or robbed. McQueen's argument in this regard does not support his claim that we should view the nature of the offense more favorable to him because had Wicker's murder involved any of the circumstances asserted by McQueen, McQueen likely

---

[1] McQueen also asserts that he "is in fact responsible for Wicker receiving medical treatment." *Appellant's Brief* at 9. This argument is, at best, misleading. McQueen did not call 911 or seek medical assistance immediately after he shot Wicker. Instead, Wicker was more concerned with concealing the weapon. Assistance was summoned by a neighbor only after the neighbor confronted McQueen about an hour after the shooting occurred and McQueen admitted what he had done.

would have faced additional charges or even been eligible for a death sentence or a sentence of life imprisonment without parole.

[11] McQueen also argues the nature of the offense was not heinous in that Wicker died from a single gunshot to the head. We acknowledge that Wicker was shot only once. However, it is the circumstances surrounding the shooting that are particularly telling. We note that in the weeks leading up to the murder, McQueen had threatened to kill Wicker because Wicker owed him money. In the days prior to the murder, a neighbor heard increasingly escalating arguments between the two men. This senseless shooting occurred when McQueen entered Wicker's home, picked up a gun, and shot Wicker, who was a lifelong friend, in the head from approximately twelve inches away. McQueen then left his friend to die alone on the floor in a pool of his own blood while he took efforts to conceal the weapon.

[12] Turning to the character of the offender, we note, as did the trial court, McQueen's extensive criminal history. We agree with the trial court that this alone justified an enhanced sentence. McQueen's criminal history began when he was fifteen years old. As a juvenile, McQueen was adjudicated for aggravated battery and escape. As an adult, McQueen's criminal convictions span decades and cross state lines. McQueen has accumulated at least thirty convictions, including felony convictions for offenses such as robbery while armed with a deadly weapon; battery by means of a deadly weapon (by using a shotgun as a club); and multiple counts of theft and forgery. He has also accumulated offenses for resisting law enforcement, public intoxication,

disorderly conduct, possession of marijuana, affray (a.k.a. fighting), tampering with a vehicle, and destruction of private or public property. Despite leniency through suspended sentences, diversion programs, and probation, McQueen continued to commit crimes. As the trial court aptly noted, McQueen's criminal history is "one that is rarely seen" and clearly reflects negatively on his character. *Transcript* at 718. Also reflecting negatively on McQueen's character is the fact that he attempted to persuade his girlfriend at the time of the shooting to not testify against him.

[13] In sum, we conclude that the nature of the offense and especially the character of the offender as demonstrated by McQueen's criminal history do not justify a downward revision of McQueen's sentence. McQueen's sixty-three-year sentence for murder is not inappropriate.

[14] Judgment affirmed.

[15] Riley, J. and Crone, J., concur.