## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 27 2017, 9:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Paul Woolley, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | July 27, 2017 <br><br> Court of Appeals Case No. <br> 83A01-1612-CR-2881 <br><br> Appeal from the Vermillion Circuit Court <br><br> The Honorable Bruce V. Stengel, Judge <br><br> Trial Court Cause No. <br> 83C01-1510-F3-5 |

**Mathias, Judge.**

[1]     John Paul Woolley ("Woolley") pleaded guilty in Vermillion Circuit Court to four counts of Level 3 felony child neglect. The trial court ordered Woolley to

serve four consecutive terms of sixteen years, for an aggregate maximum sentence totaling sixty-four years. Woolley appeals his sentence and argues that it is inappropriate in light of the nature of the offense and the character of the offender.

[2] Concluding that the horrifying nature of the offense and the atrocious neglect suffered by Woolley's four children demonstrates his appalling character, we affirm Woolley's sixty-four-year sentence.

## Facts and Procedural History

[3] Woolley and his wife Danielle have four children, J.W., C.W., S.W., and A.W. In October 2015, the children were eight, five, four, and two years old, respectively. The Woolley's parents and his brother also resided in the same home. On October 19, 2015, the Vermillion County Office of the Department of Child Services ("DCS") investigated a report involving the Woolley children. Two DCS workers and a police officer discovered the children locked in squalid bedrooms on the second floor of the Woolleys' house.

[4] When DCS and the officers arrived at the house, J.W., the eight-year-old child, was locked alone in his room, and he was naked. His hands and feet were covered in feces, and fecal matter was caked under his fingernails. He did not speak, and he sucked on his hands. The windows in J.W.'s room were boarded up, and there was no air conditioning in his room. The floor, walls, and ceiling of J.W.'s bedroom were smeared or spattered with fecal matter. The floor of J.W.'s room was completely covered in fecal matter that had been worn smooth

by people walking on it. The room was furnished only with a wooden bed frame, but no mattress. J.W. covered himself with a pile of rags or blankets, which were also covered in feces. J.W.'s room also contained a cup, bowl, and paper plates, all of which were crusted with fecal matter.

[5] Five-year-old C.W. was also naked, filthy, and locked alone in a room. C.W. screamed and did not want to be touched when Woolley picked her up to dress her. C.W. was emaciated. Four-year-old S.W. was also so thin his bones were clearly visible. S.W. and twenty-month-old A.W. were confined to cribs in the Woolleys' master bedroom. They, too, were soiled with feces.

[6] All four of the children had lice and/or fleas and their bodies were covered in bug bites. The children were non-verbal, and did not appear to recognize their names. The children were not toilet trained. J.W. was the only child who could eat solid food; the others did not know how to chew or swallow solids and ate only baby food. The children did not appear to recognize each other. Following their removal, all four children were admitted to Riley Hospital for Children in Indianapolis for treatment.

[7] At Riley Hospital, the children were diagnosed with either basic developmental delays or significant developmental delays. Eight-year-old J.W., for example, was found to be at a young toddler's age developmentally. The four Woolley children were also diagnosed with lack of medical care and feeding dysfunction or problems. C.W., S.W., and A.W. were diagnosed with failure to thrive and/or signs of malnutrition. C.W. and A.W. were diagnosed with abnormal

or poor dentation. The children's guardian ad litem stated in her victim impact statement that, "The impact of the crimes and abuse of these parents is impossible to put into words." Confidential App. p. 127.

[8] The police officers who searched the Woolleys' home after the children were removed described the condition of the home in their affidavits for probable cause. One stated that the odor inside the residence "took his breath away." Appellant's App. p. 22. Another stated, "The smell was so over whelming [sic] that you could not stay very long in the home before your eyes and nose began to burn and made you sick." *Id*. The crime scene investigator needed to wear a respirator inside the house. Shortly after the children were removed, the house was condemned.

[9] While the children were confined to upstairs bedrooms, Woolley and his wife frequently sat in the backyard by the home's pool. The children had not been outside the home for at least one year. More than one neighbor did not know that children lived in the home.

[10] The State charged Woolley with four counts of Level 3 felony neglect of a dependent resulting in serious bodily injury.[1] On March 16, 2016, without the

---

[1] The children's mother and paternal grandparents were also charged with four counts of neglect of a dependent. Danielle Woolley, their mother, received an aggregate sixty-four-year sentence. Her sentence was affirmed on appeal. *See Danielle E. Woolley v. State*, 2017 WL 1493007, No. 83A04-1608-CR-1765 (Ind. Ct. App. April 26, 2017) ("The nature of these offenses is nothing short of heinous. Woolley's sixty-four-year sentence is not inappropriate."). The children's paternal grandmother, Barbara Jo Woolley was ordered to serve an aggregate forty-three-year sentence. On appeal, she appealed the trial court's consideration of her profession, that she was a licensed practical nurse, as an aggravating factor. We determined that the trial court did not abuse its discretion in its consideration of that factor and concluded that "it is even more

benefit of a plea agreement, he pleaded guilty to all four charged offenses. On November 18, 2016, the trial court sentenced Woolley to sixteen years for each conviction and ordered him to serve his sentence consecutively. Woolley's aggregate sentence is sixty-four years. Woolley now appeals.

## Discussion and Decision

[11] Woolley argues that his sixty-four-year sentence is inappropriate under Indiana Appellate Rule 7(B). The rule provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[12] In conducting our review, "[w]e do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence

---

egregious when a nurse – a person trained in an occupation that focuses solely on the health and well-being of other people – takes no action to help her four obviously suffering grandchildren." *See Barbara Jo Woolley v. State*, 2017 WL 2291343, No. 83A05-1612-CR-2765 (Ind. Ct. App. May 25, 2017). The children's paternal grandfather, Gordon Woolley, was ordered to serve a thirty-six-year sentence. *See* Tribune Star website, http://www.tribstar.com/news/local_news/child-neglect-yields--year-prison-term/article_19e00b6d-cce8-559d-8fb5-a046858dca52.html, last visited on July 12, 2007. Because Vermillion County does not use the Odyssey case management system, this court could not obtain the actual sentencing order from mycase.in.gov. Woolley's brother, Mike, the other adult living in the house, suffers from autism and is disabled. He was not charged with neglecting the children.

portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Ultimately, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result. *Cardwell*, 895 N.E.2d at 1225. Woolley bears the burden to establish that his sentence is inappropriate. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007).

[13]    When considering the nature of the offense, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). The advisory sentence for a level 3 felony is nine years, with a sentencing range of three to sixteen years. Ind. Code § 35-50-2-5(b). Woolley's aggregate sixty-four-year sentence is the maximum sentence possible for his crimes.[2]

[14]    Concerning the character of the offender, Woolley does not have a prior criminal history, and he pleaded guilty without the benefit of a plea agreement. Woolley is also physically disabled and has suffered from rheumatoid arthritis for most of his life. However, his disability did not prevent Woolley from

---

[2] We can all take pride in the fact that Indiana observes and promotes the rule of law. However, in this instance, we would not shrink, and it is clear that the trial judge would not shrink, from imposing a much harsher sentence were it available.

normal, everyday physical activity. Most importantly, the heinous and protracted nature of his offenses are abjectly poor reflections on his character.

[15] In its sentencing statement, the trial court described the living conditions of the home and the children's suffering:

> Some people could smell the odor of urine and feces before they got on the steps or the threshold of the house. Some people could smell it outside the house and then other people smelled the odor of urine and feces after they entered the house. The people who . . . went through the house . . . wore coverings over their shoes. They wore gloves and the CSI detective goes in and . . . he's overwhelmed by the smell and has to stop and get a respirator so he can continue his investigation. Now let's remember that the children are subject to this smell on a daily basis. This horrible smell of urine and feces. . . . The stairway upstairs contained what appeared to be cat feces on the steps. [Sergeant Jim Cody] also observed and photographed different types of locks on the upstairs bedroom. These locks were installed so the operator from the exterior side of the odor rather than the interior side which would prevent a person from exiting these bedrooms. The northeast bedroom appeared to be the master bedroom. It had a queen size bed, a TV, a refrigerator, dressers, air conditioning, carpet remnant and two kids. Now that's where John and Danielle Woolley lived. . . The two cribs . . . [A.W.] and [S.W.] stayed in these cribs. We call them cribs but they were confined to these two cribs. These were actually a cage for these two children. . . [A.W.] and [S.W.] do not recognize each other. They are two boys. They were housed there together in the same room but they do not recognize each other because these were not cribs, these were cages that these boys were kept in. The southeast bedroom was the worst of all. This was [J.W.'s] room and this is the state police reporting, "The room had exposed hardwood floors. They were covered in human feces. It appeared that fecal matter had been there so long that it was smooth from

being walked over all the time." He observed feces smeared on the four walls and a door. . . . The ceiling had feces stuck to it as if it had been thrown there. Several large chunks and pieces were visible and appeared to be hanging. . . . [T]he two windows are covered by plywood and on the picture you could see that not only are they covered by plywood, they duct taped the edges of the plywood and [J.W.] was locked in that room. He could not get out. There were no toys. Apparently [J.W.'s] only toys was [sic] a sippy cup and his own feces. . . . He was not potty trained. . . . It's also easy to imagine that . . . [in the summer] temperatures reached 110, 115, 120 in that room covered with feces. How could he survive the temperature, the feces smell, no air moving? You know, you just can't describe the cruelty. . . . [T]he kids hadn't gone to doctors. They had no vaccinations. . . . The kids can't speak. They are not potty trained. Only [J.W.] is able to eat a little bit of solid food. . . . They still to this day, a year away, they can't do solid foods. They can't drink through a straw. They don't know how to chew solid foods and swallow. . . . A neighbor says . . . [he[ never saw children outside, never knew there were children in the home. . . . Although the neighbor said . . . he saw John and Danielle . . . frequently in the backyard lounging in the pool.

Tr. pp. 82-85.

[16]   The children suffered physically, psychiatrically, cognitively, medically, and socially. The children were all diagnosed as failure to thrive. They were covered in bug bites and fecal matter. They could only scream, moan and make clicking sounds. J.W. has been placed in a residential program, and, according to his medical records, may require life-long care in an assisted living facility. The guardian ad litem reported that

All the children suffer from health issues along with the indescribable mental and functional impairments they have. As a mother, I cannot imagine how these parents could subject these children to this life. I keep thinking to myself that the parents had to consciously decide not to provide even the barest of necessities for these children as all four adults in the home were functioning adults. How can you go to work, go to school, care for yourself, but decide to lock your children in a room? . . . These children never saw the sunshine, the grass, felt the snow, experienced the warmth of loving arms. Instead they were kept in rooms and cribs like caged animals. . . . The children didn't even have the consolation of each other. None experienced any recognition of their siblings. They were deprived of food, health care, love and stimulation. They don't even cry when upset, likely because it . . . never elicited a response so why bother[.]

Confidential Appellant's App. p. 127. The trial court summarized Woolley's offenses as the "brutal, callous and lifelong torture of the children," which were "so heinous and horrific in nature to be . . .beyond description nor understanding." Tr. pp. 88-89.

[17] Woolley was unimaginably and horrifically cruel to his four young children. Woolley's sixty-four-year sentence is not inappropriate in light of the nature of the offense and the character of the offender.

[18] Affirmed.

Kirsch, J., and Altice, J., concur.