## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 29 2019, 11:12 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lauren A. Jacobsen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tafari Clay,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

May 29, 2019

Court of Appeals Case No.
18A-CR-2421

Appeal from the Marion Superior Court

The Honorable Marc Rothenberg, Judge

Trial Court Cause No.
49G02-1606-MR-22838

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Tafari Clay (Clay), appeals his sentence for murder, a felony, Ind. Code § 35-42-1-1; and attempted robbery resulting in serious bodily injury, a Level 3 felony, I.C. § 35-42-5-1.

We affirm.

## ISSUE

Clay raises one issue on appeal, which we restate as: Whether Clay's sentence is inappropriate in light of the nature of the offense and his character.

## FACTS AND PROCEDURAL HISTORY

"[T]hroughout the neighborhood," Hanson Smith (Smith) was known as the "Phone Guy." (Transcript Vol. II, p. 114). Smith would buy and resell cell phones. Because "he was paying people cash to go get phones from places like Walmart," he frequently carried a lot of cash on him. (Tr. Vol. II, p. 114). Smith "did not want to be involved with a gun" and instead he carried a knife his girlfriend had given him. (Tr. Vol. II, p. 55).

On June 19, 2015, Smith had at least $12,499 on him in the car. That evening, Clay and Eron Bonner (Bonner) stopped by the house of their friend, "Vino," on Houston Street, near 21st Street and Adams, in Indianapolis, Indiana. (Tr. Vol. II, pp. 97-98). They briefly stayed on the front porch and talked with Vino's cousin, Deandre Nance (Nance), until just before 6:00 p.m. Bonner was carrying a gun and Clay and Bonner informed Nance that they were going to

"[h]it a lick on the Phone Guy," which Nance understood to mean a robbery. (Tr. Vol. II, p. 104). When Bonner received a phone call, he told the person on the line that they were "on [their] way," and Bonner and Clay left. (Tr. Vol. II, pp. 102-03). Bonner and Clay met up with Smith; Bonner entered Smith's car while Clay waited outside.

[6] Around 6:00 p.m. that evening, Indianapolis Metropolitan Police Department officers were dispatched to two different locations on reports of shots fired. Officers William Wogan (Officer Wogan) and Thomas White were dispatched to the 1900 block of Adams Street, while Officer Jamie Hadley (Officer Hadley) went to 21st Street and Olney. On route to the Adams scene, Officer Wogan was flagged down by Clay and Bonner. As soon as Officer Wogan stopped his car, he realized Bonner had been shot in the face and his mouth was bleeding. Bonner reported that "they were being chased and shot at." (Tr. Vol. II, p. 68). The officers did not find any weapons on Bonner or Clay, nor did they find any abandoned weapons in the block immediately east of the scene. A few minutes after arriving and securing the scene, Officer Wogan was advised by Officer Hadley that "she had located a person shot on Olney." (Tr. Vol. II, p. 70). A blood trail led from Bonner back to Olney Street, connecting the two crime scenes.

[7] When Officer Hadley responded to Olney Street, she was approached by a woman who had found the victim, later identified as Smith, nearby in his car and believed he was dead. Walking towards the car, Officer Hadley noticed Smith "bleeding from his chest area." (Tr. Vol. II, p. 83). Although alive when

Officer Hadley arrived, Smith passed away before officers were able to get a trauma kit on him.

[8] Smith's autopsy revealed that he had been shot twice in the abdomen and once in the forearm. The bullets had entered the right side of his body, resulting in extensive damage to all organs in Smith's abdominal cavity. These shots had caused "massive internal bleeding," which ultimately led to Smith's death. (Tr. Vol. II, p. 150). The autopsy also revealed that the wounds had no "stippling" around them, indicating that the shooter was "a little more than two, three" feet away. (Tr. Vol. II, pp. 151, 152). Blood located on the driver's side belonged to Smith, while blood found on the passenger's side was revealed to be Bonner's. The blood evidence placed Bonner inside the vehicle, while Clay was outside the car. Bullets and bullet casings recovered from the crime scene and Smith's body confirmed that there were at least two firearms involved. Both of the firearms involved were connected to Clay and Bonner. Also, the firearms examiner crossmatched the bullets and casings with those recovered in another shooting just over two weeks earlier on June 1, 2015. In connection with the June 1 case, police officers had already questioned Clay who had admitted to being in possession of one of the two guns used in that incident and identified the other gun as Bonner's. Clay had mentioned that Bonner and he had each fired their weapon that day. Both of these guns involved in the June 1 incident matched at least one bullet or casing found on the scene of Smith's murder.

[9] On June 14, 2016, the State filed an Information, charging Clay with Count I, murder; Count II, felony murder; and Count III, Level 2 felony robbery

resulting in serious bodily injury.  On August 20, 2018, the State amended Count III to Level 2 felony attempted robbery resulting in serious bodily harm. On August 21, 2018 through August 22, 2018, a jury trial was conducted.  At the close of the evidence, the jury found Clay guilty as charged.  On September 5, 2018, during the sentencing hearing, the trial court vacated Count II on double jeopardy grounds.  After considering the information contained in the presentence investigation report and testimony presented at the hearing, the trial court sentenced Clay to sixty-three years for the murder conviction and fourteen years on the Level 3 felony attempted robbery resulting in bodily harm, with both sentences to run concurrently.

[10]  Clay now appeals.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[11]  Clay contends that the trial court abused its discretion by imposing an aggregate sixty-three-year sentence.  He maintains that in light of the nature of the crime and his character, a fifty-five-year sentence—the advisory sentence for a murder conviction—is more appropriate.

[12]  Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence if, after due consideration of the trial court's decision, we find the sentence inappropriate considering the nature of the offense and the character of the offender. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).  We consider not only the aggravators and mitigators found by the trial court but also any other factors appearing in the record.  *Johnson v.*

*State*, 986 N.E.2d 852, 856 (Ind. Ct. App. 2013). We defer to the trial court's decision, and our goal is to determine whether the sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). We seek to leaven the outliers, not to achieve a perceived correct result. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Thus, "deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 23 N.E.3d 111, 122 (Ind. 2015). Ultimately, our review should focus on the aggregate sentence; that is, we "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, length of the sentence on any individual count." *Cardwell*, 895 N.E.2d at 1225.

[13] After a jury trial, Clay was convicted of murder and Level 3 felony attempted robbery resulting in bodily injury. The sentencing range for murder is 45 to 65 year, with the advisory sentence being 55 years. *See* I.C. § 35-50-2-3. A Level 3 conviction incurs a sentencing range of three years to sixteen years, with the advisory sentence being nine years. I.C. § 35-50-2-5. Finding that the aggravators outweighed the mitigators, the trial court imposed a sentence of sixty-three years for the murder charge to run concurrent to the fourteen years on the Level 3 felony conviction, for an aggregate sentence of sixty-three years.

[14]   With respect to the nature of the crime, we note that the trial court characterized the crime as "almost a lure type of situation." (Tr. Vol. III, p. 136). Clay and Bonner had planned out the attack, informing Nance they were going to "hit a lick" on the "Phone Guy." (Tr. Vol. II, p. 102, 104). They attempted to rob and ultimately murdered him. When Smith tried to defend himself, Bonner and Clay did not just walk away, instead they shot him once in the arm and twice in the abdomen. Although Clay now tries to persuade this court that he was merely "a secondary participant in [Bonner's] plan to rob [Smith]," the evidence presented suggests that Clay was more than "a follower." (Appellant's Br. pp. 19, 20). The factfinder could reasonably find that Clay fired the shots that killed Smith. No stippling was found around Smith's wounds during the autopsy, indicating that the shooter was no more than three feet away. As Bonner was in the car with Smith, Clay was the only one standing outside and able to shoot Smith without leaving any stippling. Viewing the totality of the facts, we find that the murder was carried out through "subterfuge, deceit, and careful planning" when Smith was lured to his death. *See Anglemyer*, 868 N.E.2d at 494. Accordingly, we do not find Clay's sentence inappropriate as to the nature of the offense.

[15]   With respect to his character, we note that Clay was twenty years old at the time of the offense. At the sentencing hearing, the trial court recognized that Clay had "been a criminal since the age of 13" and had now "become a predator." (Tr. Vol. III, p. 134). The court acknowledged that Clay's "criminal history is one that career criminals do not develop." (Tr. Vol. III, p. 132).

Despite his young age, Clay accumulated ten true findings as a juvenile, including, among others, residential entry, receiving stolen property, theft, battery (2), and possession of cocaine. As an adult, Clay had had six arrests, which resulted in one misdemeanor conviction and one felony conviction. At the time of the offense, Clay was both on pretrial release for possession of marijuana and on probation for robbery. By the time of the sentencing hearing, Clay had been acquitted of another murder charge but convicted of possession of marijuana.

During the sentencing hearing, Clay made a statement of allocution, in which he stated, "I'm not here to say sorry because . . . I didn't do anything. If I could change anything about this situation, I would just change that I was there." (Tr. Vol. III, p. 125). Despite the evidence, Clay did not take responsibility for the role he played in Smith's murder, nor did he take responsibility for any of his previous crimes, and merely painted himself as a victim of a failed juvenile system. Mindful of the facts before us, we cannot conclude that Clay's sentence is inappropriate in light of his character.

## CONCLUSION

Based on the foregoing, we hold that Clay's sentence is not inappropriate in light of the nature of the crime and his character.

Affirmed.

Bailey, J. and Pyle, J. concur