## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 29 2019, 9:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samantha M. Sumcad
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rodney Evans,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

October 29, 2019

Court of Appeals Case No.
19A-CR-958

Appeal from the Marion Superior Court

The Honorable Sheila A. Carlisle, Judge

Trial Court Cause No.
49G03-1708-MR-31041

**Crone, Judge.**

# Case Summary

[1] Rodney Evans appeals his five-year sentence in the Department of Correction ("DOC") imposed for his conviction for the level 5 felony involuntary manslaughter of his friend Rodney Lewis. Evans argues that his sentence is inappropriate based on the nature of the offense and his character. Concluding that Evans has failed to carry his burden to show that his sentence is inappropriate, we affirm.

# Facts and Procedural History

[2] On April 21, 2017, sixty-year-old Evans lived at 2450 North Webster Avenue, Indianapolis, with Darrell Holton and Darrell's girlfriend Tishawn Blackwell. Evans has spinal stenosis and arthritis in both of his knees. In 2011, the Social Security Administration determined that he was disabled under the Social Security Act. Evans uses a cane to walk and had several canes in his home. That night, Evans, Lewis, and two of Evans's female friends drank alcohol and smoked marijuana at Evans's home. Holton and Blackwell were in Holton's bedroom.

[3] On April 22, 2017, at about 4:00 a.m., Indianapolis Metropolitan Police Department ("IMPD") Officers Samuel House and Ross Allison were dispatched to the 2400 block of North Webster Avenue to investigate the report of a person down. The officers found a black male, later identified as Lewis, who was "severely beaten" and lying in the front yard of 2456 North Webster Avenue. Tr. Vol. 2 at 71. Lewis was bleeding from the head and appeared to

have suffered "severe head trauma." *Id*. at 60. His "face was all bloody, swollen," and his "[c]lothes were bloody." *Id*. at 71. Lewis was grunting or moaning. He was also wet and shivering from being out in the cold. The officers immediately called for an ambulance.

[4] Lewis was taken by ambulance to the hospital. He suffered extremely severe injuries to his face and head. He never regained consciousness and was transferred to a hospice facility where he died of his injuries in August 2017. An autopsy revealed that edema resulting from his head trauma caused his brain to stop controlling his vital organs, he was unable to swallow, and sputum aspirated in his lungs. *Id*. at 167.

[5] After locating Lewis, Officers Allison and House investigated the area and observed "drag marks" that appeared to lead to Evans's house. *Id*. at 61, 72. Following the drag marks, the officers observed blood on the driveway and Evans's front porch. IMPD Detective Christopher Edwards arrived, and the officers showed him where Lewis had been found and the drag marks. Detective Edwards observed "blood drops from the sidewalk [in front of Evans's house] into the driveway, and then further into the driveway, and then on the porch and the little sidewalk area that led up to the porch, and then on the handrail, and then even on the outside of the door." *Id*. at 87. Detective Edwards knocked on the door, and Evans answered. Detective Edwards immediately saw blood on the floor inside the house, blood spatter on the wall, and blood on Evans's shirt, pants, and socks. *Id*. at 89. Police got everyone out

of the house, took Evans, Holton, and Blackwell to the police station for questioning, and obtained a search warrant for Evans's house.[1]

[6] Evans was advised of and waived his rights and agreed to speak to the police. His statement was recorded. State's Ex. 28; State's Ex. 29 (transcript of statement). Evans told Detective Edwards three versions of what happened, finally admitting that he hit Lewis with his cane and that Lewis was so injured he was unable to walk out of the home. Conf. Ex. Vol. 1 at 65-99; Tr. Vol. 3 at 83. In summary, Evans told police that on April 21, he smoked crack cocaine. Sometime later, two lady friends came to his home, and the three drank alcohol and smoked marijuana. That evening, Lewis joined the group and also drank alcohol and smoked marijuana. During the night, Evans consumed a pint and a couple of beers.[2] Conf. Ex. Vol. 1 at 76. At some point, Holton and Blackwell entered the home and went into Holton's bedroom.

[7] Late in the evening, Lewis began to get on Evans's nerves, and Evans told Lewis to leave. *Id.* at 73; Tr. Vol. 3 at 79. Lewis refused. Evans grabbed Lewis, and the two men began grabbing and pushing each other. Lewis grabbed a board and started swinging it at Evans. Conf. Ex. Vol. 1 at 81-82. Evans hit the board out of Lewis's hands, and the men fell against the wall and broke chairs. Evans was very angry. *Id.* at 81. At one point, Holton came out

---

[1] The record is unclear as to when Evans's two female friends left the home.

[2] At trial, Evans testified that he was drinking gin and beer. Tr. Vol. 3 at 55.

of his bedroom, but Evans told him that he did not need his help, and Holton returned to the bedroom. *Id.* at 80. Evans eventually pulled Lewis over to the side door and out of the house.

[8] Lewis returned, knocked on the front door, and started yelling. Evans opened the door, and Lewis pushed his way into the house. *Id.* at 92. The two started fighting again. Evans hit Lewis with his cane five to ten times. *Id.* at 94. Lewis was on the ground, attempting to cover himself from the beating. *Id.* at 95. Evans dragged Lewis out of the house, down the porch, and over to the adjacent yard. *Id.* at 95-96. Evans's cane was broken, so he threw it in the trash can outside his house where police found it. *Id.* at 98.

[9] The State charged Evans with murder. A jury trial was held. During the State's case in chief, the trial court admitted the recording of Evans's statement and a transcript of that statement into evidence. State's Exs. 28 and 29. Evans took the stand and asserted that he hit Lewis in self-defense. His trial testimony was different in several respects from the statement that he gave to police. Tr. Vol. 3 at 83. Most significantly, he testified that in addition to drinking alcohol and smoking marijuana, Lewis smoked synthetic marijuana and afterward started acting strangely. *Id.* at 79. Evans testified that he had to physically force Lewis out of his home twice, and Lewis forced himself into the home the second time he returned. Evans testified that while he and Lewis were wrestling, Holton came out of his bedroom and used Evans's cane to hit Lewis several times, and that it was Holton who broke Evans's cane. *Id.* at 71. Evans testified that Holton asked Blackwell to bring him his pistol, which he used to

hit Lewis, and that was why Lewis had such severe injuries. *Id.* at 72-74. Evans also testified that Holton was the person who dragged Lewis outside, and when Holton came back in the house, he washed his hands and changed his clothes.[3] *Id.* at 74-75, 82.

[10] The jury found Evans guilty of the lesser included offense of level 5 felony involuntary manslaughter. At sentencing, the trial court found that Evans had used crack cocaine, marijuana, and alcohol on the day of his offense, and that Evans had a history of drug and alcohol abuse that had "virtually consumed" his adult life. *Id.* at 186. That history included a dishonorable discharge from the Army in 1984 due to possession of marijuana, a 1999 conviction for class D felony maintaining a common nuisance, and three inpatient stays in facilities for substance abuse treatment. The trial court noted that despite that history, Evans had indicated in the presentence investigation report ("PSI") that he had never had a problem with alcohol or drugs. Further, Evans was initially offered probation for his class D felony conviction, but he violated the conditions of probation, and it was revoked. The trial court also observed that Lewis was Evans's friend, yet Evans had beat him and left him "discarded in a front lawn to lay there and suffer after the beating that he endured." *Id.* at 188. The trial court also noted that Evans's trial testimony and deposition were inconsistent,

---

[3] Holton testified as a witness for the State via deposition. Tr. Vol. 2 at 219-50. He testified that he broke up "a little scuffle" between Evans and Lewis, that he never saw Evans hit Lewis with a cane or other object, that Lewis fell in the house and broke a chair, that Lewis fell down at least two times outside, that Lewis was yelling that someone was chasing him, and that he did not know how Lewis ended up in the condition he was in. *Id.* at 225, 231, 234, 238, 242-43, 248, 250.

and that Evans had lied. Finally, the trial court observed that although Evans was disabled, his disability did not prevent him from beating Lewis and inflicting injuries so serious that they resulted in Lewis's death. The trial court found that a slightly aggravated sentence was appropriate and sentenced Evans to five years, all executed. This appeal ensued.

## Discussion and Decision

[11] Evans asks us to revise his sentence pursuant to Indiana Appellate Rule 7(B), which states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). In conducting our review, we may consider all aspects of the penal consequences imposed by

the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). In addition, as we assess the nature of the offense and character of the offender, "we may look to any factors appearing in the record." *Boling v. State*, 982 N.E.2d 1055, 1060 (Ind. Ct. App. 2013). Evans has the burden to show that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.

[12] Turning first to the nature of the offense, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). The sentencing range for a level 5 felony is one to six years, with an advisory sentence of three years. Ind. Code § 35-50-2-6(b). The trial court imposed a sentence above the advisory and ordered it fully executed in the DOC. Evans contends that a fully executed sentence above the advisory is inappropriate.

[13] Specifically, Evans asserts that the sentence is inappropriate because the jury concluded that he did not commit murder or voluntary manslaughter, and Lewis's death was the tragic, unintended consequence of a conflict between two friends, which was precipitated by Lewis's drug-induced behavior. Evans's argument relies on his self-serving trial testimony, which was inconsistent with his police statement. Undeniably, Evans contributed to the brutal beating of his friend, much of it delivered while Lewis cowered on the ground. Then, Lewis

was dragged outside and abandoned on the ground in the cold in the middle of the night. Despite the severity of Lewis's injuries, Evans made no attempt to obtain medical help for Lewis. The nature of Evans's crime does not persuade us that an executed sentence above the advisory is inappropriate.

[14] As to Evans's character, he points to his relatively inconsequential criminal history. However, he ignores that his class D felony maintaining a common nuisance was based on his use of drugs and that he committed the current offense after using drugs and alcohol. Thus, although he has but one prior felony, it is significant because of its similarity to the current offense. Additionally, although Evans was granted the benefit of probation, he was unable or unwilling to obey the conditions of his probation, and it was revoked. None of this reflects well on Evans's ability to conform his behavior to the law.

[15] Evans argues that commitment to the DOC is unsuitable because he needs genuine drug treatment and is disabled. Although he now argues that he needs drug treatment, Evans failed to acknowledge that he had a drug problem in the PSI. Should Evans decide to address his substance abuse issues, he can receive substance abuse treatment while incarcerated by participating in the Purposeful Incarceration program as recommended by the trial court. Evans's disability did not prevent him from committing the current offense, and he does not specifically articulate why his disability makes incarceration inappropriate. We further observe that Evans appears to have a deceitful character, as shown by the significant differences between his trial testimony and his statement to police. His lack of compassion toward Lewis, his friend, reflects poorly on his

character as well. Evans presents no evidence of virtuous traits or persistent examples of good character. Accordingly, Evans's character does not persuade us that a term of incarceration in the DOC above the advisory sentence is inappropriate.

We conclude that Evans has failed to carry his burden to show that his sentence is inappropriate based on the nature of the offense and his character. Therefore, we affirm.

Affirmed.

Baker, J., and Kirsch, J., concur.