## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 09 2020, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leon J. Liggitt
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tina L. Mann
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Tearra Montgomery,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 9, 2020

Court of Appeals Case No.
20A-CR-946

Appeal from the St. Joseph
Superior Court

The Honorable Elizabeth C.
Hurley, Judge

Trial Court Cause No.
71D08-1808-F1-17

**Mathias, Judge.**

[1]     After a bench trial, the St. Joseph Superior Court found Tearra Montgomery guilty of two counts of Level 1 felony neglect of a dependent causing death and

one count of Level 2 felony battery resulting in death to a person less than fourteen years old. To avoid double jeopardy concerns, the court ultimately entered judgment of conviction on two counts of neglect of a dependent, one as a Level 1 felony and one as a Level 6 felony. The trial court then imposed the maximum sentence: consecutive terms of forty years for the Level 1 felony and two-and-one-half years for the Level 6 felony. Montgomery appeals, arguing that her aggregate forty-two-and-one-half-year sentence is inappropriate in light of the nature of the offenses and her character.

[2] We affirm.

## Facts and Procedural History

[3] Tearra Montgomery began dating Asia Harris sometime in early 2018. A few months later, Montgomery moved into Harris's two-bedroom apartment with Harris and her nineteen-month-old son Z.H. That August, Harris worked nights—cleaning two banks after-hours—and Montgomery was unemployed. So, while Harris was at work, she often left her son in Montgomery's care

[4] On August 10, Z.H. woke up not feeling well—due in part to an eye irritation—and Montgomery and Harris both had toothaches. The three had a "lazy day at home." Tr. Vol. 2, p. 18. Z.H. "just wanted to sleep" throughout the day, but the toddler was able to eat, drink, and use the bathroom as he normally would. *Id.* at 17–18. Harris had to work later that night. Before leaving, she bathed Z.H., gave him some medicine to help him sleep, and put him to bed. Harris left for work around 11:00 p.m., and Montgomery stayed behind with Z.H.

Just before 1:30 a.m., Montgomery called 911 and reported that Z.H was unresponsive. Officers and paramedics arrived within minutes, and Z.H. was transported to a local hospital. The "main thing" one of the responding officers remembered about Montgomery's demeanor that night "was she was hesitant to contact [Harris]." *Id.* at 48. But she eventually did, and Montgomery told Harris that "she went in the room to do a check-up, and that [Z.H.] wasn't breathing." *Id.* at 24. At the hospital, "after about 40 to 45 minutes," *id.* at 43, the medical staff was able to get a pulse from Z.H. But the toddler tragically died later that morning.

The same day, Montgomery was twice interviewed by homicide detectives. During the first interview, which lasted several hours, there were "numerous story changes" about what happened to Z.H. Tr. Vol. 3, p. 51. Montgomery was then taken into custody because she had an outstanding bench warrant for failing to appear for court on an unrelated traffic offense. A few hours later, Montgomery "had somebody in the jail" contact one of the detectives because "she hadn't been a hundred percent honest" in the first interview. *Id.* at 47. In the second interview, Montgomery again provided multiple versions of what happened to Z.H. *See* Ex. Vol, State's Ex. 43.[1] But she eventually told the detectives that Z.H. "was crying and wouldn't stop crying, so she buried his face into a robe until he stopped crying." Tr. Vol. 3, pp. 48–49; *see also* Ex. Vol.,

---

[1] State's Exhibit 43, which has been thoroughly reviewed, is a video recording of Montgomery's second interview with law enforcement.

State's Ex. 43. As a result, the State charged Montgomery with three crimes: two counts of Level 1 felony neglect of a dependent resulting in death and one count of Level 2 felony battery resulting in death to a person less than fourteen years old.

[7] In January 2020, Montgomery was tried in a bench trial during which several witnesses were called. Dr. Darin Wolfe, who performed Z.H.'s autopsy, explained that the toddler had an approximate three-inch-long skull fracture that occurred "in close proximity to the death." Tr. Vol. 2, p. 91. He further explained that this type of fracture "typically involves significant force." *Id.* at 88. Dr. Robert Yount, a neurosurgeon who reviewed the relevant medical and police records, testified that Z.H.'s skull fracture is the type "you would see after the child was thrown with force against a flat surface." Tr. Vol. 3, p. 14. Yet, Dr. Yount indicated that Z.H. "likely would have survived [this] injury," *id.* at 9, had he not also been suffocated. Dr. Yount also clarified that the "skull fracture happened within an hour of the suffocation." *Id.* at 16. The evidence also included testimony and DNA evidence relating to a red bloodstain that was discovered—about six feet high—on one of the apartment walls. Tr. Vol. 2, pp. 109–12, 122; Ex. Vol., State's Exs. 18–22. The stained area included "tiny hair fibers," Tr. Vol. 2, p. 111, and a subsequent DNA test confirmed the presence of Z.H.'s blood, Ex. Vol., State's Ex. 44.

[8] About a month after trial concluded, the court issued a detailed order finding Montgomery guilty as charged. Appellant's App., pp. 7–10. At the first of two sentencing hearings, the court, to avoid double jeopardy concerns, merged the

Level 2 felony battery with one count of Level 1 felony neglect, leaving two counts of Level 1 felony neglect of a dependent resulting death. But prior to entering judgment, the court expressed concern whether the two identified acts that resulted in Z.H.'s death—causing the injury and failing to seek immediate medical treatment—could serve as the basis for two Level 1 felony convictions. Tr. Vol. 4, p. 14. Prior to the court making a determination, it "consider[ed] aggravating factors and mitigating factors[.]" *Id.* at 20. The court observed that Montgomery's criminal record included only one prior offense and thus did not give "much weight to [this] criminal history in aggravation." *Id.* at 20. But, after detailing several "facts and circumstances of this case," the trial court found "that the aggravating factors outweigh any factors in mitigation[.]" *Id.* at 20–21. It then entered judgment of conviction on both Level 1 felonies and imposed an aggregate seventy-year sentence.

[9] A few weeks later, the trial court held a second sentencing hearing after confirming its initial concern that there could not be two convictions for Level 1 felony neglect in this case: "there aren't two deaths here; there's one death." *Id.* at 27. Thus, the court reduced one of the Level 1 felonies to a Level 6 felony and entered judgment accordingly. It then concluded that the aggravating factors justified consecutive sentences and that "the heinous nature of the offenses" justified a maximum sentence on each count. *Id.* at 27–28. So, the trial court imposed a maximum aggregate sentence of forty-two-and-one-half years. Montgomery now appeals this sentence.

# Discussion and Decision

[10] Montgomery argues that her aggregate forty-two-and-one-half-year sentence is inappropriate under Indiana Appellate Rule 7(B),[2] which provides the standard by which we exercise our constitutional authority to review and revise sentences. Under this rule, we modify a sentence when we find that "the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). Making this determination "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Yet, sentence modification under Rule 7(B) is reserved for "a rare and exceptional case." *Livingston v. State*, 113 N.E.3d 611, 612 (Ind. 2018) (per curiam).

[11] When conducting this review, we generally defer to the sentence imposed by the trial court. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Indeed, our role is to "leaven the outliers, and identify some guiding principles for trial courts

---

[2] Notably, Montgomery does not challenge her aggregate sentence on the basis that it runs afoul of the statutory cap on consecutive sentences prescribed by Indiana Code section 35-50-1-2(d). Except for crimes of violence, the statute dictates that "the total of the consecutive terms of imprisonment to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct may not exceed" forty-two years when "the most serious crime for which the defendant is sentenced is a Level 1 felony." *Id.* The statute further instructs that "'episode of criminal conduct' means offenses or a connected series of offenses that are closely related in time, place, and circumstance." *Id.* § -2(b). Here, Montgomery's most serious crime was a Level 1 felony, and our legislature has not included neglect of a dependent as a "crime of violence." *Id.* § -2(a). Thus, if Montgomery's offenses "arose out of an episode of criminal conduct," then the total consecutive term of imprisonment she could receive is forty two years—six months less than the sentence imposed. But, because neither party has raised an argument under Section 35-50-1-2, we decline to address the issue sua sponte. If the sentence is indeed erroneous, we trust that it will be corrected below. *See* I.C. § 35-38-1-15.

and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell*, 895 N.E.2d at 1225. Thus, deference to the sentence imposed by the trial court will prevail unless the defendant produces compelling evidence portraying in a positive light the nature of the offense—such as showing restraint or a lack of brutality—and the defendant's character—such as showing substantial virtuous traits or persistent examples of positive attributes. *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018); *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[12] Before explaining why Montgomery has failed to make such a showing here, we first acknowledge that the trial court imposed a maximum sentence: consecutive terms of forty years for the Level 1 felony, and two-and-one-half years for the Level 6 felony. Ind. Code §§ 35-50-2-4, -7. We have often said that maximum sentences should generally be reserved for the worst offenders and offenses. *See, e.g., Payton v. State*, 818 N.E.2d 493, 498 (Ind. Ct. App. 2004), *trans. denied*. But determining which cases constitute "the worst of the worst" is a task we entrust to our trial courts—they "will know them when they see them." *Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011). While Montgomery asserts that her maximum sentence is inappropriate because she did not commit "the very worst offense" and she "is not the very worst offender," Appellant's Br. at 9, the trial court found otherwise based on the evidence presented, Tr. Vol. 4, pp. 27–28. And Montgomery has failed to show that the maximum sentence imposed by the court is inappropriate based on the nature of the offenses and her character.

[13] Turning first to the nature of the offenses, Montgomery notes only that the trial court "cited the age of the child and the pain experienced by the child," which she asserts is already an essential part of her Level 1 felony conviction. Appellant's Br. at 8. Though this may be true, Montgomery has not produced any evidence, let alone "compelling evidence," that portrays the heinous nature of these offenses in a positive light. *Stephenson*, 29 N.E.3d at 122. In fact, quite the opposite is true.

[14] The evidence produced at trial supports the court's conclusion that Montgomery threw nineteen-month-old Z.H. into a wall and suffocated the toddler. Appellant's App., p. 9;[3] *see* Tr. Vol. 2, pp. 82–83, 87–88, 91, 97, 109–11; Vol. 3, pp. 8–9, 11–14, 16–17; Ex. Vol., State's Exs. 18–22, 43–44. More specifically, the record reveals that, while Z.H. was in Montgomery's care, she slammed the toddler up against a wall, fracturing his skull. Then, rather than seek immediate medical treatment, Montgomery suffocated Z.H.—to stop his crying—by holding the toddler facedown into his own bathrobe. We echo the trial court's observation that it is "hard to fathom that anyone could have done that to a child." Tr. Vol. 4, p. 21. Simply put, the heinous nature of these offenses does not support revision of Montgomery's maximum sentence. *Cf. Hamilton*, 955 N.E.2d at 727 (recognizing that harsher sentences are supported by "younger ages of victims" as well as "when a defendant has violated a

---

[3] The trial court issued findings of fact and conclusions of law following Montgomery's bench trial even though it was not required to do so. *Dozier v. State*, 709 N.E.2d 27, 30 (Ind. Ct. App. 1999). We commend the trial court, as its findings and conclusions—which are supported by the evidence—have aided our review.

position of trust"). And she has also failed to show that her sentence is inappropriate based on her character.

[15]  Turning to Montgomery's character, she merely asks us to consider her "lack of criminal history." Appellant's Br. at 9. Though we acknowledge that Montgomery has only one prior offense, a traffic-related misdemeanor, **any** criminal offense reflects poorly on a defendant's character. *See, e.g.*, *Prince v. State*, 148 N.E.3d 1171, 1174 (Ind. Ct. App. 2020). And the effect of this limited criminal history on Montgomery's character is exacerbated by the fact that she had an outstanding bench warrant related to the traffic offense. Appellant's Conf. App., p. 27. Further, Montgomery does not point to any "substantial virtuous traits" or "persistent examples of good character." *Stephenson, 29 N.E.3d at 122*. Rather, the record reveals that she silenced a crying toddler by holding him facedown into a bathrobe; she provided several different versions of the events leading to Z.H.'s death; and she has a history of neglecting her own biological children, Appellant's Conf. App., p. 16. In short, Montgomery has not shown that her sentence is inappropriate based on her character.

## Conclusion

[16]  Montgomery has not met her burden of demonstrating that her aggregate forty-two-and-one-half-year maximum sentence is inappropriate in light of the nature of the offenses and her character. We affirm.

Altice, J., and Weissmann, J., concur.