


FILED

Apr 30 2024, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Court of Appeals of Indiana

David R. Benjamin,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

April 30, 2024

Court of Appeals Case No.
23A-CR-2367

Appeal from the Knox Circuit Court

The Honorable Gara U. Lee, Special Judge

Trial Court Cause No.
42C01-1910-F3-18

---

**Opinion by Judge Pyle**
Judges Bailey and Crone concur.

**Pyle, Judge.**

## Statement of the Case

David R. Benjamin ("Benjamin") appeals, following a jury trial, his conviction for Level 3 felony aggravated battery.[1]  Benjamin argues that the trial court abused its discretion by admitting a doctor's testimony regarding whether the victim's injuries created a substantial risk of death.  Benjamin has waived his evidentiary appellate challenge because he objected at trial on one ground and raised a different ground on appeal.  Further, because we conclude that any error in the admission of the evidence was harmless, we affirm Benjamin's conviction.

We affirm.

## Issue

> Whether the trial court abused its discretion by admitting testimony from a doctor regarding whether the victim's injuries created a substantial risk of death.

## Facts

On September 25, 2019, Benjamin believed that Lawrence Yarber, Jr. ("Yarber") had stolen a friend's ATV.  That evening, Benjamin, along with three other men, went to Yarber's house in Knox County to confront Yarber.

---

[1] IND. CODE § 35-42-2-1.5.

At that time, Yarber and his girlfriend, Jennifer Held ("Held"), were in the driveway. Benjamin and Yarber argued about the ATV. Benjamin punched Yarber's face, causing Yarber to fall to the ground. Benjamin "then started kicking [Yarber] in his head . . . [and] wouldn't stop." (Tr. Vol. 2 at 101). Benjamin and the other three men eventually left the scene. Held took Yarber to the local hospital, which later transported Yarber by helicopter to an Evansville hospital. Held "thought [that] [Yarber] was going to die." (Tr. Vol. 2 at 103). When Held talked to the police, she identified Benjamin as the person who had beaten Yarber.

[4] Yarber remained in the Evansville hospital for six days, and he was in a medically-induced coma for five of those days. Yarber's "orbital" socket was "crushed[.]" (Tr. Vol. 2 at 118). The medical staff wired Yarber's jaw shut and inserted a trach tube and a feeding tube. Yarber's jaw remained wired for six weeks. Yarber signed himself out of the hospital against medical advice. Thereafter, Yarber had several return visits to the emergency room for his injuries.

[5] The State charged Benjamin with Level 3 felony aggravated battery and alleged that he was an habitual offender. The trial court held a two-day jury trial in August 2023. During the State's opening statement, the prosecutor stated that Yarber's family physician, Dr. Caroline Steinman ("Dr. Steinman"), would be testifying about Yarber's injuries. The prosecutor also stated that Dr. Steinman would tell the jury that Yarber's "injuries caused a substantial risk of death from at least two standpoints[,]" including "the potential for severe brain injury" and

"bleeding" in his "facial cavity" that could "lead to infection . . . [and] "sepsis." (Tr. Vol. 2 at 92). During Benjamin's opening statement, his counsel told the jury that Benjamin would be disputing the extent of Yarber's injuries and whether there was a substantial risk of death.

[6] The State presented testimony from, among others, Held, Yarber, and Dr. Steinman. During Held's testimony, she testified to the facts as set forth above. Yarber and Dr. Steinman provided further testimony about Yarber's injuries sustained after Benjamin had beaten him as well as testimony about Yarber's hospitalization and treatment following his discharge from the hospital.

[7] Yarber testified that he did not have any memory of the details of how his injuries had occurred. Yarber remembered being at his house and then nothing else until he woke up in the hospital from his five-day coma. Yarber further testified that when he woke up, he had "freaked out" because his mouth was wired shut, he had a trach tube, and he did not know where he was. (Tr. Vol. 2 at 157). Yarber also testified that his injuries required doctors to "cut [him] from ear to ear[,] . . . pull[] [his] face down[,]" and insert a "steel plate[.]" (Tr. Vol. 2 at 158). Additionally, Yarber testified that he had memory issues, constant numbness on the "whole right side of [his] face[.]" (Tr. Vol. 3 at 159).

[8] Dr. Steinman testified that, as Yarber's family physician, she was familiar with the injuries that Yarber had sustained in the incident with Benjamin. Dr. Steinman, who had reviewed Yarber's medical records from his hospitalizations, provided details of the injuries that Yarber had sustained and

explained that the majority of Yarber's injuries had been to his face and head. Specifically, Dr. Steinman testified that Yarber had sustained "severely comminuted fractures of the anterior, posterior, medial, lateral, superior, and inferior maxillary sinuses[,]" and explained that a "comminuted" fracture meant that the bone was "broken up into small pieces and displaced." (Tr. Vol. 3 at 7). Yarber also had "a comminuted fracture of [his] anterior and posterior right zygomatic arch" or "cheekbone[.]" (Tr. Vol. 3 at 7). Additionally, Dr. Steinman testified that Yarber had "[c]omminuted fractures . . . of the medial and lateral pterygoid processes[,]" which was "the bone that[] . . . makes up the middle of [the] face behind [the] cheekbone." (Tr. Vol. 3 at 8). Moreover, Yarber had "bilateral nasal bone fractures[,]" "fractures of the inferior and lateral right orbital rim[,]" and a fracture of his "nasal septum" which was "the middle of [the] nose kind of back in [the] skull[.]" (Tr. Vol. 3 at 8-9). Dr. Steinman opined that the beating of Yarber had to have been a "quite violent" encounter "[g]iven the extent of [Yarber's] facial fractures[.]" (Tr. Vol. 3 at 20). Dr. Steinman testified that Yarber still had a metal bar in his cheekbone along with multiple little screws and wires that had connected his bone fragments together.

[9] Dr. Steinman also explained that Yarber had had his jaw wired shut to support a fracture to his facial bone that was "unstable" to the point that "if you grabbed [Yarber's] teeth, you could move his teeth and his cheek at the same time." (Tr. Vol. 3 at 24). Dr. Steinman also explained that Yarber had been unable to "keep his throat free of blood . . . [and] spit" and that the hospital

medical staff had had to intubate Yarber "to help him breathe because he couldn't protect his airway by himself." (Tr. Vol. 3 at 24). She further explained that, because Yarber's jaw had been wired shut, the hospital doctors had had to intubate Yarber by doing a tracheostomy. Moreover, Yarber had a "PEG tube[,]" which was "a tube that goes from the outside of [the] belly into [the] stomach" to provide nutrition. (Tr. Vol. 3 at 25). Dr. Steinman also explained that Yarber had had multiple ER visits after his hospitalization based on issues he had had with his two tubes, including an ER visit for a MRSA infection with one of the tubes.

[10] Dr. Steinman also testified that, when she had examined Yarber in her office in November 2019, she had diagnosed Yarber as having a traumatic brain injury. Dr. Steinman explained how the brain was surrounded by cerebrospinal fluid in the skull and how the brain could be injured during a "repeated acceleration and deceleration injury[.]" (Tr. Vol. 3 at 17). Additionally, Dr. Steinman testified that the side effects of traumatic brain injury included memory deficits and mood disorders.

[11] After Dr. Steinman testified about the details of Yarber's injuries, the State asked Dr. Steinman, "In your medical opinion, do you believe that these injuries caused a substantial risk of death?" (Tr. Vol. 3 at 28). At the same time that Benjamin objected, Dr. Steinman responded, "Oh, absolutely" to the State's question. (Tr. Vol. 3 at 28). Benjamin's objection was based on a "[l]ack of foundation." (Tr. Vol. 3 at 28). Benjamin further stated that Dr. Steinman's "expert opinion" testimony "require[d] a foundation[.]" (Tr. Vol. 3

at 28). Benjamin stated that "substantial risk of death [wa]s a legal term . . . , not a medical term" and that Dr. Steinman had not provided any medical testimony regarding "anything that gave rise to any finding of substantial risk of death[.]" (Tr. Vol. 3 at 28). The State responded that it "was going to flip that" but that it would "ask those questions first." (Tr. Vol. 3 at 28). The trial court then told the State that it "may do so." (Tr. Vol. 3 at 28). The State then proceeded to ask Dr. Steinman further questions about Yarber's injuries.

[12] Dr. Steinman then testified that Yarber had been "confused," and his face had been "covered in blood" when he had arrived at the local ER. (Tr. Vol. 3 at 29). She also testified that the ER staff, upon noticing "a large amount of blood in the back of [Yarber's] throat," suctioned his mouth to remove the blood and allow him to breathe. (Tr. Vol. 3 at 29). When Dr. Steinman then stated that if Yarber had not gone to the local ER then "that blood could have easily -- [,]" Benjamin objected. (Tr. Vol. 3 at 29). Specifically, Benjamin objected that this specific testimony, or attempted testimony, was "speculative" because Dr. Steinman had stated "could of" and had tried to testify about "what might have happened . . . in the event [that] [Yarber] hadn't sought treatment." (Tr. Vol. 3 at 29). Benjamin also stated that Dr. Steinman was "not the proper witness to make that determination" because she had not been the treating ER doctor and that she was trying to "speculate as to this ultimate issue of fact . . . that this jury has to determine." (Tr. Vol. 3 at 30). The trial court overruled Benjamin's objection to this portion of Dr. Steinman's testimony. The State then posed a "hypothetical" scenario to Dr. Steinman, asking her what she believed, based

on her "medical opinion . . . [and] training and experience," would have happened if Yarber had "sustained this injury, went down, was unconscious, [and] nobody was around." (Tr. Vol. 3 at 30). Dr. Steinman replied that "he would have breathed in that blood and died." (Tr. Vol. 3 at 30). The doctor explained that Yarber "had blood throughout his maxillary sinuses and also in his ethmoid sinuses, which [are] the holes in [the] skull" and that he had "blood pooling in the back of his throat." (Tr. Vol. 3 at 30).

[13]     The State then questioned Dr. Steinman about the "danger of infection," and the doctor responded that it was "[s]ignificant" with injuries that are close to the brain and that it was "easy[] for bacteria from [the] skin or from [the] mouth to get inside of those cavities." (Tr. Vol. 3 at 31). The doctor also confirmed that such an infection could lead to sepsis. When the State asked Dr. Steinman to explain sepsis, Benjamin again objected based on speculation. Benjamin stated that he objected to such testimony about "things that might have happened" because it was "speculating for the purpose of meeting the standard, the ultimate question of fact for this jury to decide." (Tr. Vol. 3 at 31-32). The State responded that it was required to prove a substantial risk of death and that an infection was a "substantial risk of this particular type of injury based on the testimony . . . from this doctor." (Tr. Vol. 3 at 32). The trial court overruled the objection and stated that the "weight the jury gives it is up to them." (Tr. Vol. 3 at 32). Dr. Steinman then confirmed that sepsis was "a critical risk of [Yarber's] type of injury" that could be "potentially fatal." (Tr. Vol. 3 at 33).

[14] Thereafter, Benjamin's counsel thoroughly cross-examined Dr. Steinman regarding her testimony about Yarber's injuries and specifically questioned her about the "substantial risk of death[.]" (Tr. Vol. 3 at 36, 37, 51, 52, 53, 54, 55, 56, 58, 59). Benjamin's counsel had Dr. Steinman clarify that no treating physician had made a specific documentation in the hospital medical records to state that Yarber was under a substantial risk of death and that such a term was a legal term and not a medical term. Benjamin's counsel also established that Yarber had not been unconscious when he had gone to the ER, had not choked on his blood, and had never had sepsis. Additionally, Benjamin's counsel questioned Dr. Steinman about her diagnosis that Yarber had a traumatic brain injury and whether Yarber's memory loss could have been related to his history of drug use. Moreover, Benjamin's counsel had Dr. Steinman confirm that Yarber had suffered serious bodily injury.

[15] During closing arguments, Benjamin argued that the State had failed to prove that Yarber's injuries created a substantial risk of death because the doctor had merely testified about things that could have happened but did not. Benjamin also argued that there had been "no evidence presented . . . that [Yarber] [wa]s in any danger of dying in the future as a result of the injuries he [had] sustained in this case." (Tr. Vol. 3 at 84).

[16] The trial court instructed the jury on the elements of Level 3 felony aggravated battery and also on the lesser-included offense of Level 5 felony battery resulting in serious bodily injury. The jury found Benjamin guilty of Level 3 felony aggravated battery, and Benjamin admitted that he was an habitual

offender. The trial court imposed a fourteen (14) year sentence, with six (6) years executed and eight (8) years suspended to probation for Benjamin's Level 3 felony conviction, and the trial court enhanced that sentence by fourteen (14) years for his habitual offender adjudication.

[17] Benjamin now appeals.

## Decision

[18] Benjamin argues that the trial court abused its discretion by admitting testimony from Dr. Steinman regarding whether Yarber's injuries created a substantial risk of death. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012), *reh'g denied*.

[19] Benjamin specifically challenges only Dr. Steinman's response to the State's following question, "In your medical opinion, do you believe that [Yarber's] injuries caused a substantial risk of death?" (Tr. Vol. 3 at 28). At the same time that Benjamin objected, Dr. Steinman responded, "Oh, absolutely." (Tr. Vol. 3 at 28). Benjamin's objection was based on a "[l]ack of foundation." (Tr. Vol. 3 at 28). However, now on appeal, Benjamin argues that the trial court should not have allowed this specific testimony about the substantial risk of death

because it violated Indiana Evidence Rule 704.[2] Benjamin contends that Dr. Steinman's testimony equated to the doctor determining an ultimate issue instead of the jury making such a determination.

[20] It is well established that a party may not object on one ground at trial and raise a different ground on appeal. *White v. State*, 772 N.E.2d 408, 411 (Ind. 2002). Because Benjamin's trial objection was limited to foundational concerns and did not specifically reference any challenge under Indiana Evidence Rule 704, we conclude that he has waived this issue on appeal. *See Brittain v. State*, 68 N.E.3d 611, 619 (Ind. Ct. App. 2017) (finding waiver when defendant's appellate argument regarding evidence admissibility was different than trial objection and noting that "a party may not present an argument or issue to an appellate court unless the party raised the same argument or issue before the trial court"), *trans. denied*.

[21] Benjamin does not acknowledge that his trial objection differs from the basis he argues on appeal. Nor does Benjamin argue that Dr. Steinman's response affirming that Yarber's injuries caused a substantial risk of death constituted fundamental error. Thus, we will not engage in such a review. *See Bradfield v. State*, 192 N.E.3d 933, 935 (Ind. Ct. App. 2022 (explaining that a defendant waived his admission of evidence appellate argument by arguing a different

---

[2] Indiana Evidence Rule 704(a) provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable just because it embraces an ultimate issue." Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

ground on appeal and also waived any fundamental error claim by not raising it on appeal).

[22] Waiver notwithstanding, and assuming arguendo that the trial court abused its discretion by admitting the testimony, we conclude that the admission of evidence was harmless error. Our Indiana Supreme Court has explained:

> When an appellate court must determine whether a non-constitutional error is harmless, Rule 66(A)'s "probable impact test" controls. Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below. Importantly, this is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented. And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case. Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined.

*Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (internal citations omitted), *reh'g denied*, *cert. denied*.

[23] Our review and consideration of the entire record reveals that Dr. Steinman, Held, and Yarber all testified about details of Yarber's injuries. Indeed, we have set forth that detailed testimony in the above facts, and Benjamin did not challenge the evidence relating to his specific injuries. Furthermore, during Benjamin's cross-examination of Dr. Steinman, he asked the doctor multiple questions about the substantial risk of death. The probable impact of any

possible error in admitting Dr. Steinman's response affirming that Yarber's injuries caused a substantial risk of death, in light of all the evidence in this case, is sufficiently minor so as not to undermine our confidence in the outcome of this case. *See id. See also Stahl v. State*, 219 N.E.3d 157, 165 (Ind. Ct. App. 2023) (explaining that "expert medical testimony is not required to prove the substantial risk of death element of aggravated battery" and that, instead, a jury may rely on its collective common sense and knowledge acquired through everyday experiences), *trans. denied*. Accordingly, we affirm Benjamin's conviction.

Bailey, J., and Crone, J., concur.

ATTORNEY FOR APPELLANT

Andrew Bernlohr
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana